2013-1295

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ICON INTERNET COMPETENCE NETWORK B.V.,

Plaintiff-Appellant,

v.

TRAVELOCITY.COM LP,

Defendant-Appellee.

---

**Appeal from the United States District Court for the Northern District of Texas in case no. 13-CV-0263, Judge Reed C. O'Connor**

---

## PRINCIPAL BRIEF OF PLAINTIFF-APPELLANT

---

Date:   June 28, 2013

Guy Fisher, *Lead Counsel*
PROVOST ✶ UMPHREY LAW FIRM, L.L.P.
490 Park Street
P.O. Box 4905
Beaumont, Texas  77704
Tel:  (409) 835-6000
Fax:  (409) 838-8888
Email:  gfisher@pulf.com

Guy E. Matthews
C. Vernon Lawson
Matthew C. Juren
Erik J. Osterrieder
Matthews Lawson PLLC
2000 Bering Drive, Suite 700
Houston, Texas  77057
Tel:  (713) 355-4200
Fax:  (713) 355-9689
Email:   vlawson@matthewsfirm.com
          mjuren@matthewsfirm.com
          ejo@matthewsfirm.com

**ATTORNEYS FOR PLAINTIFF-APPELLANT**

Form 9

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ICON Internet Competence Network B.V. v. Travelocity.com LP

No. 2013-1295

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Appellant _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

ICON Internet Competence Network B.V.

_____

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

ICON Internet Competence Network B.V.

_____

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

_____

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Provost Umphrey Law Firm LLP; Matthews Lawson, PLLC; Moore Landry, LLP

_____

|  |  |
|---|---|
| __4/5/13__<br>Date | _Erik J. Osterrieder_<br>Signature of counsel |
|  | ERIK J. OSTERRIEDER<br>Printed name of counsel |

Please Note: All questions must be answered

cc: _____

124

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ................................................................ iv

I.    STATEMENT OF RELATED CASES ........................................... 1

II.   STATEMENT OF JURISDICTION ............................................. 1

III.  STATEMENT OF THE ISSUES ................................................. 1

    A.  Did the district court err in its construction of the asserted patent claims in this case? .......................................................... 1

    B.  Did the district court err in granting Defendant's second motion for summary judgment of non-infringement? ........................ 1

IV.   STATEMENT OF THE CASE ................................................... 1

V.    STATEMENT OF FACTS ......................................................... 2

    A.  Disclosure of the '853 Patent ........................................ 2

    B.  Asserted Claims of the '853 Patent ............................... 7

    C.  The Prosecution History of the '853 Patent ................. 8

    D.  Proceedings Below ........................................................ 8

    E.  The District Court's Rulings ......................................... 9

VI.   SUMMARY OF THE ARGUMENT .......................................... 9

VII.  ARGUMENT ........................................................................ 11

    A.  Standard of Review ...................................................... 11

    B.  The District Court Erred in Claim Construction .......... 12

          1.      A "Screen Display" Is a Collection of Data or Information Used in Constructing a Visual Display (i.e., a Webpage). ...........................................................................13

          2.      Commercial Area Should Not be Limited to a "Scene". ..........20

          3.      Navigation Occurs At The Screen Display. ..............................24

   C.     The Trial Court Erred in Granting Summary Judgment to Defendant. ................................................................................26

          1.      The District Court Improperly Compared Defendant's Website with the Construed Claims. .........................................26

          2.      The District Court Improperly Reduced the Summary Judgment Issue to One of Claim Construction. .......................27

          3.      Sufficient Evidence Existed That Warranted Denying Summary Judgment. ................................................................30

VIII.  CONCLUSION............................................................................34

ADDENDUM

PROOF OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Cases*                                                                                                    *Page*

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ....................................................................................32

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.,*
    73 F.3d 1372 (Fed. Cir. 2007) ..............................................................28, 29

*Boss Indus., Inc. v. Yamaha Motor Corp. U.S.A., Inc.,*
    333 F.App'x 531 (Fed. Cir. 2009) ......................................................... 15-16

*CFMT, Inc. v. Yieldup Internat'l Corp.,*
    349 F.3d 1333 (Fed. Cir. 2003) ...............................................................11

*Cybor Corp v. FAS Techs., Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998)*(en banc)*..............................................11, 13

*Enzo Biochem, Inc. v. Applera Corp.,*
    599 F.3d 1325 (Fed. Cir. 2010) ...............................................................11

*Ferring B.V. v. Barr Labs, Inc.,*
    437 F.3d 1181 (Fed. Cir. 2006) ......................................................10, 26, 32

*Fujitsu Ltd. v. Netgear Inc.,*
    620 F.3d 1321 (Fed. Cir. 2010) ......................................................10, 11, 26

*General Mills, Inc. v. Hunt–Wesson, Inc.,*
    103 F.3d 978 (Fed. Cir. 1997) ...............................................................28

*Glaxo Group Ltd. v. TorPharm, Inc.,*
    153 F.3d 1366 (Fed. Cir. 1998) ......................................................12, 27, 30

*International Rectifier Corp. v. IXYS Corp.,*
    361 F.3d 1363 (Fed. Cir. 2004) ...............................................................28

*Nazomi Comms., Inc. v. ARM Holdings, PLC,*
    403 F.3d 1364 (Fed. Cir. 2005) ......................................................17, 20, 23

iv

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)   ................................................16, 17, 20, 23

*Sentry Protection Products, Inc. v. Eagle Mfg. Co.,*
    400 F.3d 910 (Fed. Cir. 2005)   ............................................................11, 13

*Uniloc USA, Inc. v. Microsoft Corp.,*
    632 F.3d 1292 (Fed. Cir. 2011);   ........................................10, 12, 26, 28, 29

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)   ..................................................................16

## Other Authority

28 U.S.C. § 1338(a) ..................................................................................................1

28 U.S.C. § 1295(a)(1).............................................................................................1

# I.    STATEMENT OF RELATED CASES

There are no related cases under Federal Circuit 47.5.

# II.    STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction of this patent infringement action under 28 U.S.C. § 1338(a).  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).  ICON Internet Competence Network B.V. ("ICON") appeals the final judgment of the U.S. District Court, Northern District of Texas (Dallas), dated February 22, 2013, which disposes of all claims between the parties.

# III.    STATEMENT OF THE ISSUES

A.    Did the district court err in its construction of the asserted patent claims in this case?

B.    Did the district court err in granting Defendant's second motion for summary judgment of non-infringement?

# IV.    STATEMENT OF THE CASE

ICON is appealing the district court's summary judgment finding of non-infringement for claims 1-7, 10, and 11 of United States Patent 6,002,853 ("the '853 Patent").  ICON also appeals the district court's claim constructions issued on June 1, 2012.  The district court entered final judgment on February 22, 2013.

## V.    STATEMENT OF FACTS

### A.    Disclosure of the '853 Patent

### 1.    A "Screen Display" Does Not Require a Visible, Physical Monitor at A Client.

The term "screen display" is integral to the proper scope of each claim of the '853 Patent as it is used throughout each of the independent claims 1, 10, and 11. A62-A63.

A "screen display" generated by the server claimed in the '853 Patent generally has the following elements:  graphics items arranged to give the appearance of at least part of a commercial area"; "at least some of the graphics items having the appearance of storefronts"; "respective graphics items being associated with respective businesses"; "multiple storefronts of the screen display being associated with businesses of the same category depending on the search request"; "the screen display being navigable to reveal graphics items adjacent those that are displayed"; and "the selection of individual graphics items for inclusion in the screen display varying depending on the results of the search." *See, e.g.,* A62, claim 1, 10:23-48.  Within the context of the claims at issue, the "screen display" is generated by the server for the purpose of communicating it to the client, the claims do not contain any such limitation that such communication or transmission actually occur.  The '853 Patent discloses and teaches a server enabled to communicate with a client that is further enabled to receive a search

2

request *via* a client, the server then using the received search request to generate specially formatted results in the form of a screen display. Each of the claims is directed to the structure and actions of the server. In this context, the specially formatted results that are generated at and by the server are intended, but not required, to be transmitted to the client over a digital network using a transport protocol. To that point, the screen display generated by the server is necessarily digital information. The '853 Patent specification discloses several examples of how this digital information could be formatted for the client, including HTML documents, VRML documents, QuickTime VR files, or other markup type language and/or video type files. A60, 5:36–6:9. The specification discusses the use of web pages and that they are typically written with HTML (hypertext markup language) and can include text, references to graphics files on the servers, as well as hyperlinks. Only when the viewed on a computer and opened in a specifically designed browser or program do the graphics get combined with the text on a single screen. A58, 2:60-67. "A markup language [HTML] is a way of describing, using instructions embedded within a document, what the document text means, or what it is supposed to look like. … A markup language is a collection of codes, embedded in the document, that explain the meaning and desired formatting for the marked text." A1753-A1754. "HTML is designed specifically for marking up electronic documents for delivery over the Internet, and for presentation on a

3

variety of different possible displays." A1754. As described in the '853 Patent, "Web browsers such as Mosaic and Netscape allow a client to view text, graphics (*e.g.*, "GIFs", JPEGs"), or a combination of text and graphics to the client from a server accessed by the client." A59, 3:17-20.

### 2.    A "Commercial Area" Should Not Be Limited To A "Scene".

The term "commercial area" is neither defined in the claims nor given any special meaning within the specification of the '853 Patent. A1871 and A1781. The claim language recites "commercial area" in the context of "the screen display [...] including graphics items arranged to provide the appearance of at least part of a commercial area." A62, claim 1, 10:23-48.

Specifically, claim 9 recites: "A server in accordance with claim 1 wherein the server generates a virtual reality scene in response to the client requesting a search of the database, the virtual reality scene defining the screen display." A63, 11:5-8. The Abstract of the '853 Patent describes a "server having virtual reality means for generating a virtual reality scene, the virtual reality scene varying depending on the results of the search." A50, *Abstract*. The '853 Patent specification states upfront that it is presenting the "[p]referred embodiments of the invention". A59, 4:7-8. Figures 4A, 4B, and 5-10 illustrate example embodiments described as "virtual reality scenes produced by the system of FIG. 1." A59, 4:17-

20.  Figure 1 being described as "a block diagram illustrating a system embodying the invention."  A59, 4:10-11.

The '853 Patent teaches that a "virtual reality scene is a scape in which a user can navigate by looking up, looking down, turning around, zooming in, or zooming out."  A60, 5:44-46.  In the discussion of one embodiment, the database contains "basic information (*e.g.*, business name, address, phone number) for each business" and additional information such as "graphics (*e.g.*, storefront 98), size of display information, location of display information, virtual reality scenes, virtual reality objects, and hyperlinks, or any combination of such additional information for each business."  A60, 6:46-55.  The '853 Patent specification further discusses the illustrated embodiment as having server that "creates a virtual reality space by selecting and assembling graphics or virtual reality spaces and items in response to the results of the database search."  A61, 8:45-47.

### 3.    Navigation Occurs Within the Context of the Screen Display, Not a Separate Scene.

The plain language of claims 1, 10, and 11 insists that the screen display is navigable, or permits interactive direction, rather than the graphics items comprising the commercial area. A62, claim 1, 10:23-48 ("*the screen display being navigable* to reveal graphics items adjacent those [other graphic items] that are displayed").  The '853 Patent specification uses "navigate" and "navigation" to describe the ability of a user to interact with the information presented in a screen

display. The specification contemplates the use of a conventional keyboard and/or mouse to direct or navigate the screen display. A60, 5:25-31. The '853 Patent teaches that a "virtual reality scene is a scene in which a user can navigate by looking up, looking down, turning around, zooming in, or zooming out." A60, 5:44-46. "For example, in one embodiment, a navigable virtual reality scene is presented comprising a street having storefronts 98, 100, 102, 104, 106, 108 representing the best hits from the database search." A61, 8:53-56.

### 4.    Background Facts to Summary Judgment

Defendant maintains a website at the address http://www.travelocity.com, comprising a server, one or more databases comprising at least information about hotels, flights, car rental services, and cruise information. A2878. Enabling this website are servers, software, and hardware that are configured to generate webpages comprising code and instructions for selecting and arranging images from the search results to be presented to a user on a display. A313-14; A896-97. The visible difference between webpages and screenshots are that the former contains code and instructions, and the latter is simply a picture of what one sees on a display. *Id*. As a result, a user would understand a screenshot, but normally have no reason or desire to read a webpage, presuming the webpage is even available in the first place.

Defendant moved for summary judgment alleging there was "no evidence of infringement by the accused website [*sic*] where the images of storefronts are a subset of the images comprising the commercial area." A306. To controvert this allegation, ICON adduced three screenshots showing Defendant's accused devices are configured to generate "images of storefronts [that] are a subset of the images comprising the commercial area." A828, A830, A832. In addition, ICON adduced its expert's declaration, incorporated herein by this reference, showing that a person having ordinary skill in the art would know that screenshots are *not* the same as webpages, images are only selected or arranged on a server as computer information or code representing such images, and what screenshots might render is simply not determinative of whether Defendant's servers, software and methods infringe ICON's claims. A823, A826-A837, A894-A901. A webpage on a server is not what is seen by a user on at a remote computer. A896.

## B.    Asserted Claims of the '853 Patent

ICON asserts as infringed claims 1-7, 10 and 11 of the '853 Patent. A1566. Claim 1 is drawn to a server having a database, receiving a search query, searching the database and preparing a screen display containing data arranged to provide information about multiple storefronts in the appearance of a commercial area. A62, 10:23-48. Claims 2-7 are each dependent from claim 1 and add additional limitations such as particular inclusions of fields within the database of claim 1.

A62-A63, 10:49-11:2.  Claim 10 contains similar limitations of claim 1, but is drawn to a memory bearing software to be executed on by a server.  A63, 11:9-12:4.  Claim 11 is drawn to a method of requesting a search query, searching a database, and preparing a screen display containing data responsive to the search query.  A63, 12:5-25.

### C.    The Prosecution History of the '853 Patent

The '853 Patent was issued by the U.S. Patent and Trademark Office on December 14, 1999. A50.  The '853 Patent is a continuation-in-part of U.S. Application No. 08/548,873, filed October 26, 1995, issued as U.S. Patent No. 5,737,533 ("the '533 Patent").  A50.

### D.    Proceedings Below

The parties filed briefs in support of their respective claim construction positions and argued their respective positions at the claim construction hearing before the district judge.   The parties further filed briefs in support of their respective positions regarding Defendant's second motion for summary judgment of non-infringement.   ICON accompanied its brief in opposition to Defendant's second motion for summary judgment of non-infringement with declarations, testimony, and a report by its expert, Dr. Tewfik.

### E.    The District Court's Rulings

The district court's Claim Construction Order, A516-A543, construed the term "screen display" as meaning "screen visible on the client"; "graphics items arranged to provide the appearance of a commercial area" as meaning "images arranged into a scene resembling an area having businesses"; and "screen display being navigable to reveal graphics items adjacent those that are displayed" as meaning "screen visible on the client that is able to permit movement through the scene to display additional graphics items near or adjoining other graphics items previously visible in the scene".  A542-A543.

The district court's Order, A2-A22, granted Defendant's second motion for summary judgment of non-infringement of each claim of the '853 Patent.

## VI.    SUMMARY OF THE ARGUMENT

The district court's claim construction order was in error with respect to its construction of the term "screen display" as meaning "screen visible on the client" because such a construction is not supported by the specification and the claims do not require that a visible representation of information be presented at the client, much less transmitted to the client.  As a result, the constructions and errors by the district court cascaded throughout the other terms and phrases offered for construction.

9

Likewise, the district court's construction of "graphics items arranged to provide the appearance of a commercial area" was in error by unduly limiting the claim language to require "a scene", when such a limitation is unsupported by the specification and contrary to a dependent claim.

The district also court erred in its construction of the phrase "screen display being navigable to reveal graphics items adjacent those that are displayed" by requiring that the navigation occur within a subset of the "screen display" (*i.e.*, the "commercial area") rather than within the "screen display" itself.

The district court erred in granting summary judgment by improperly comparing the construed claims to the accused device and methods, reducing the matter to one of claim construction, and failing to view ICON's evidence, presented in the form of expert testimony and documents, in the light most favorable to ICON because genuine issue(s) of material fact remained.  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1302 (Fed. Cir. 2011); *Ferring B.V. v. Barr Labs, Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d at 1325-26.  Any of these reasons for granting summary judgment constitutes reversible error as a matter of law.

In sum, the district court's judgment was in error with respect to its determination of non-infringement by Defendant of claims 1-7, 10 and 11, as well

as its claim constructions. The district court's judgment of non-infringement and claim constructions should be reversed by this Court.

## VII.  ARGUMENT

### A.    Standard of Review

The issues raised by the district court's order involve claim construction issues, sufficiency of evidence on summary judgment, expert opinions and testimony and weight of the evidence.  Claim construction is a matter of law reviewed *de novo*. *Sentry Protection Products, Inc. v. Eagle Mfg. Co*., 400 F.3d 910, 913 (Fed. Cir. 2005); *Cybor Corp v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998)(*en banc*)).  Accordingly, the issues on appeal depend entirely on claim construction and/or issues of law and are reviewed *de novo*.

Moreover, this Court reviews without deference a district court's grant of summary judgment, and reapplies the standard applicable at the district court. *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1331 (Fed. Cir. 2010); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1325-26 (Fed. Cir. 2010); *CFMT, Inc. v. Yieldup Internat'l Corp.*, 349 F.3d 1333, 1337 (Fed. Cir. 2003).  A court considering summary judgment must "view the evidence presented through the prism of the substantive evidentiary burden."  *CFMT, Inc. v. Yieldup Internat'l Corp.*, 349 F.3d at 1337.  In reviewing summary judgment, the court must also

draw all reasonable inferences and all factual disputes in favor of the nonmovant. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d at 1302; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment must be reversed if any errors of law were made unless an independent legal ground exists in the record to affirm. *Glaxo Group Ltd. v. TorPharm, Inc.*, 153 F.3d 1366, 1370 (Fed. Cir. 1998).

### B.    The District Court Erred in Claim Construction

The district court erred in several ways in the construction of the claims of the '853 Patent. The initial error is the district court's construction of "screen display," which has a cascading effect throughout the remainder of the district court's claim constructions. Moreover, the district court's constructions unduly limit the claims to the preferred embodiment by importing limitations from the specification into the claims, when the plain language of the claims do not lend themselves to such a construction. Additionally, the doctrine of claim differentiation mandates that the "commercial area" should not be defined as a "scene," which also cascades error into the final construction provided by the district court. The construction of "navigation" issued by the district court is in error because it limits the navigation to a subset of the "screen display" (*i.e.*, the scene) rather than to the "screen display" as required by the plain language of claims 1, 10, and 11.

12

Questions of claim construction are reviewed *de novo*. *Sentry Protection Products, Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 913 (Fed. Cir. 2005); *Cybor Corp v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998)(*en banc*)).

### 1. A "Screen Display" Is a Collection of Data or Information Used in Constructing a Visual Display (*i.e.*, a Webpage).

The intrinsic evidence of the '853 Patent makes clear that a "screen display" is the information that is compiled and prepared for transmission to the client, such as a webpage. *See*, A59-A61.

The district court construed "screen display" to mean "screen visible on the client." The term "screen display" appears explicitly in four of the terms offered for construction at the district court and implicitly in one of the constructions issued by the district court. The phrases invoking the term "screen display" are (claim 1) "generating a *screen display*"; (claims 10 and 11) "caus[e][ing] a *screen display* to be generated for the client"; (claims 1, 10, and 11) "multiple storefronts of the *screen display*"; (claims 1, 10, and 11) "*screen display* being navigable to reveal graphics items adjacent those that are displayed", and implicitly in (claims 1, 10, and 11) "appearance of respective storefronts" which the district court construed as "the look of the front exterior of each business in a screen visible on the client" directly incorporating the district court's construction of "screen display". A542-A543

13

The district court's analysis of "screen display" began with an examination of the intrinsic evidence to determine whether or not the "screen display" is limited to the form of a webpage, as proposed by ICON.  A526.  The district court found that even though "the specification discusses web pages and web browsers when describing the background of the invention and the prior art, the specification does not limit the screen display to a webpage."  A526. Instead the district court went on to refer to a very specific embodiment of using "a virtual reality helper application to view the text or graphics of the virtual reality space" to preclude a finding that "a webpage or similar information for constructing a visual display" would be "a limitation … where the claim language does not include such a limitation."  A526 (citing A59, 3:18-20; A61, 8:49-52).

The district court continued its analysis of "screen display" by examining Defendant's argument that "'screen display' necessarily implies a 'visible' screen, given that Figures 5 through 10, described as 'screens that are sent from the server to the client in response to a database search query, *see* [A62] '853 Patent col.9 ll.60-61, all depict the screen as a scene visible to the user's computer."  A526. The district court then incorporated Defendant's argument that the plain and ordinary meaning of "'display' suggests that the item displayed be visible" citing to several general usage dictionaries.  A526.  The district court went further and stated "the fact that the screen display must be navigable to reveal additional

14

graphics items does not suggest that the graphics items initially present on the client are not visible." A527. The district court continued by finding that "the figures and written description support a construction that defines 'screen display' as something that is visible." A527. The district court made one more finding concerning the construction of "screen display" which was that "the inclusion of the requirement that the screen display be visible to the user's computer is consistent with the dictionary definition of 'display.'" A527.

The district court, within its memorandum opinion and order regarding Defendant's second motion for summary judgment, held:

> [T]he '853 patent requires a server that selects and arranges images "for inclusion in a screen visible on the client," and the screen visible on the client must include "images arranged into a scene resembling an area having businesses, at least some of the images having the look of the front exterior of a business."

A14. The district court went on to proclaim that "the language of the patent claims focuses on what is included in the screen display, which the Court has construed as 'a screen visible on the client.'" A15.

The district court's reliance upon *Boss Indus., Inc. v. Yamaha Motor Corp. U.S.A., Inc.*, is inapposite with the present case. In *Boss Industries*, the Federal Circuit and district court were examining the construction of the single word "adjacent" to determine the context of the positioning of a "storage section" relative to a "flexible seat section, having a storage cavity formed therein." *Boss*

*Indus., Inc. v. Yamaha Motor Corp. U.S.A., Inc.*, 333 F.App'x 531, 541 (Fed. Cir. 2009). The Federal Circuit found that claim 5 of the patent-in-suit "alone does little to clarify the parties' dispute, [but] the figures in the specification support the proposition that the term [adjacent] means 'next to or adjoining.'" *Id.* As shown by figure 10, the storage section is directly 'next to or adjoining'-not merely 'close to'-the flexible seat section." The Federal Circuit then further supported its position by relying on contemporary dictionary definition for the term "adjacent." *Id.* However, as the Federal Circuit and the district court in this case acknowledged, this must be done with care in light of *Phillips*, 415 F.3d at 1322-23, wherein reliance "on dictionary definitions … so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *Boss Indus., Inc. v. Yamaha Motor Corp. U.S.A., Inc.*, 333 F.App'x 531, 541 (Fed. Cir. 2009) (citing *Phillips*, 415 F.3d at 1322-23 (quoting *Vitronics*, 90 F.3d at 1584 n.6)).

In the present case, the district court turned to the figures and written description to hold that they "support a construction that defines 'screen display' as something visible." A527. The district court then confirmed this holding with circular logic that "the inclusion of the requirement that the screen display be visible to the user's computer is consistent with the dictionary definition of 'display.'" A527. This cannot be supported in the context of the claims or the

16

term itself, especially in light of the claims not reciting any limitation that the generated "screen display" actually be transmitted by the server to a client.  A62, claim 1. "[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments". *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005); *Nazomi Comms., Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005)(claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification").

The examples provided by the '853 Patent specification disclose how the digital information returned as part of the search result could be formatted for the client, including HTML documents, VRML documents, QuickTime VR files, or other markup type language and/or video type files. A60, 5:36-6:9.  Indeed, the "Brief Description of the Drawings", which describe the very figures the district court relied upon in-part to reach its conclusion of requiring "something that is visible", specifically state that they "illustrate how a virtual reality scene is made" and "illustrate sample virtual reality scenes produced by the system of FIG. 1." A59, 4:17-20.

The client is described as "compris[ing] computers such as minicomputers, microcomputers, UNIX (TM) machines, mainframe computers, personal computers such as an Intel (TM) 286, 386, 486, or Pentium (TM) personal

17

computers or clones thereof or Apple (TM), Macintosh (TM), or PowerPC (TM) personal computers or clones thereof, or any other appropriate computer, in any combination." A60, 5:3-11. The client may then have "loaded in memory 44 web browsers 48 such as Mosaic or Netscape (see FIG. 2)." A60, 5:22-24. The "Web browsers such as Mosaic and Netscape allow a client to view text, graphics (*e.g.*, "GIFs", "JPEGs"), or a combination of text and graphics presented to the client from a server accessed by the client." A59, 3:17-20. The client may also have "loaded in memory 44 virtual reality viewers 50." A60, 5:24-25. It is important to note that the term "virtual reality" as used by the specification "is not necessarily meant to describe the type of virtual reality that involves the use of gloves and helmets or goggles, but instead is used to describe the type of virtual reality that permits navigation through a scene, or manipulation of objects, using a mouse and keyboard." A60, 5:25-35. Further describing the interaction that can exist between the client's web browser and a "virtual reality viewers," the specification describes the "web browsers are each configured to launch the virtual reality viewer 50 as a 'helper application' then the client is presented with a virtual reality file type." A60, 5:58-60.

The specification describes a specific embodiment that coincides with the claim 1 element of "generating a screen display for the client" by stating: "the server creates a virtual reality space by selecting and assembling graphics or virtual

18

reality spaces and items in response to the results of the database search." A61, 8:45-47. While the next steps described for this specific embodiment are not claimed limitations, they provide context that the server generates information that is not necessarily visible, as was determined by the district court, but a collection of data and information (such as a webpage). The next steps described are: "the server 12 sends a virtual reality space to the client. [Then] the client recognizes that virtual reality information is being sent, and launches a virtual reality viewer (*e.g.*, a web browser launches a virtual reality helper application such as QuickTime for Virtual Reality)." A61, 8:48-52.

The district court's reliance on dictionaries for construing the "display" portion of "screen display" as "suggest[ing] that the item displayed be visible" is at odds with the context of the claims and specification, which describes the use of web browsers and virtual reality viewers in the specific embodiments. A60, 5:22-25. Further, the specification's description of the client having "web browsers [that] are each configured to launch the virtual reality viewer 50 as a 'helper application,' then the client is presented with a virtual reality file type" is additional confirmation that the screen display is the collection of data or information used in constructing a visual display, *i.e.*, a webpage. A60, 5:58-60. The "screen display" in that context would be the information comprising the "virtual reality file type", wherein such information contained within such a file

19

may indeed be visible once received and processed by the client and/or the client's web browser, but the independent claims 1, 10, and 11 do not include such a requirement.

For these reasons, the district court's construction of "screen display" as "a screen visible on the client" should be vacated, and ICON respectfully requests that this Court construe "screen display" to mean "a collection of data or information used in constructing a visual display (*i.e.*, a webpage)".

## 2.    Commercial Area Should Not be Limited to a "Scene".

The district court erred when it unnecessarily included the limitation of a "scene" into the construction of the disputed phrase "graphics items arranged to provide the appearance of at least part of a commercial area."  A533. *Phillips*, 415 F.3d 1323; *Nazomi*, 403 F.3d 1369 (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification").

ICON asks that this Court to vacate the district court's construction of "graphics items arranged to provide the appearance of at least part of a commercial area", and, instead, construe it as "[the screen display includes] images arranged to provide the depiction of an area having businesses and images having the look of the front exterior of a business."

To start, the district court analyzed the construction of "graphics items arranged to provide the appearance of at least part of a commercial area, at least

20

some of the graphics items having the appearance of storefronts" by examining the constituent elements "graphics items", "graphics items arranged to provide the appearance of at least part of a commercial area", "storefronts", and "at least some of the graphics items having the appearance of storefronts." With regard to the phrase "graphics items arranged to provide the appearance of at least part of a commercial area", the district court analyzed this phrase within the context that "neither the claim nor the specification defines "commercial area." A529. The district court then went on to mention that Plaintiffs' urged a "plain and ordinary meaning" based on an amalgamation of dictionary definitions of "area" being "a part of a house, lot[,] district, city, etc. having a specific use or character" in combination with "commercial" as "being part of a building, lot district, city, etc. having a commercial use or character." A529-A530. The district court then turned to Defendant's proposed construction of "commercial area" as being "a scene resembling a street having businesses." The district court performed no further analysis regarding the term "commercial area" beyond that it did not require a graphical representation of a "street" A531. In the district court's discussion about why the graphical depiction of a "street" was not necessary, the district court continuously referred to the screen display as being a "virtual reality scene" and "virtual scene." A531. The district court went so far as to find that "the specification is not so clear and unambiguous as to support a finding that the

fundamental nature of the invention requires a virtual scene depicting a street." A531. And, again, the district court found that "the specification does not, however, make the inclusion of a street a requirement of the virtual reality scene" within the context of construing the constituent term "storefront". A532. The district court then concluded its discussion of the entire phrase "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" by construing the entire phrase to mean "images arranged into a scene resembling an area having businesses, at least some of the images having the look of the front exterior of a business." A533. The district court did not continue or expound upon its ruling of why the limitation of "scene" was necessary to include in the construction of the constituent term "commercial area", especially in light of its prior statements that "the specification is not so clear and unambiguous as to support a finding that the fundamental nature of the invention requires a virtual scene depicting a street." A531.

It is important to note that the limitation currently under review is a sub-element of "generating a screen display for the client", discussed in section VII(B)(1) above, such that it "include[es] graphics items arranged to provide the appearance of at least part of a commercial area." A62, claim 1. The '853 Patent's discussion of "scene(s)" or "spaces" are usually within the context of "virtual

reality scene" or "virtual reality space", an explicit limitation found only in non-asserted claim 9. A59, 4:17-20 ("Figs 4a, 4B illustrate how a virtual reality scene is made. Figs. 5-10 illustrate sample virtual reality scenes produced by the system of Fig. 1"); A61, 8:45-47 ("the server creates a virtual reality space by selecting and assembling graphics or virtual reality spaces and items in response to the results of the database search."). A thorough description of the example embodiment, however, should not undermine the rule that limitations from the example embodiment should not be read into the claims. Indeed, this Court "has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005)(*en banc*).

Additionally, if the district court's construction incorporated the usages of the term "scene" as a broader form of "virtual reality scene", the district court's construction is equally faulty. *Phillips*, 415 F.3d 1323; *Nazomi*, 403 F.3d 1369 (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification"). Claim 9, which explicitly recites the term "virtual reality scene", claims that "the server generates a virtual reality scene […], the virtual reality scene defining the screen display." A63, claim 9, 11:5-8. As discussed previously, the element "including graphics items … commercial area"

23

is a sub-element to the parent phrase "generating a screen display for the client." Dependent claim 9's further limitation that "the virtual reality scene defin[e] the screen display" belies the conclusion that the "scene", if it is indeed being used as a broader term than virtual reality scene, is a sub-set of the screen display.

For the reasons stated above, Appellant respectfully requests that this Court vacate the district court's construction of "graphics items arranged to provide the appearance of at least part of a commercial area" and instead construe this phrase to mean "[the screen display includes] images arranged to provide the depiction of an area having businesses".

### 3.    Navigation Occurs At The Screen Display.

The third claim construction of the district court sought for review is that of "screen display being navigable to reveal graphics items adjacent those that are displayed", which the district court erroneously construed as "screen visible on the client that is able to permit movement through the scene to display additional graphics items near or adjoining other graphics items previously visible in the scene." A541.  As is readily apparent, the erroneous constructions discussed in sections VII(B)(1) and (2) above were incorporated by the district court and infect the construction of this phrase.    The district court also found "that the specification's consistent use of the term 'navigate' in its description of the embodiments teaches that the term "navigate" is used to describe movement

24

through the *scene*, rather than the mere ability to control." A540 (*emphasis added*). The district court, when discussing the constituent term "navigate," made the additional finding that "Travelocity's proposed construction of the term 'navigable' does not invalidate claim 9, but rather gives full force to claim 1, which claims a screen display that is able to be navigated, rather than one that merely remains static." A540. Here, the district court stated that claim 1 provides "a screen display that is able to be navigated", but then went on to limit the navigation to that of a "scene", which the district court imported as a further limitation upon the screen display. A540, fn. 4.

The district court's erroneous construction of "screen display" as requiring a "screen visible on the client" and the unnecessary importation of the term "scene" into the claim language of "commercial area" causes an erroneous outcome that belies the plain language of "*screen display being navigable* to reveal graphics items adjacent those that are displayed." By its very language, the phrase insists that it is the "screen display" itself that is capable of "being navigable", not a "scene" which the district court improperly imported into the "commercial area" limitation discussed above in section VII(B)(2).

In light of the discussion above in sections VII(B)(1) and (2), ICON asks that this Court vacate the district court's claim construction of "screen display being navigable to reveal graphics items adjacent those that are displayed" and

construe it as meaning "the screen display includes information enabling interactive direction at the client to reveal graphics items  adjacent those being displayed."  Wherein, "adjacent" has its plain and ordinary meaning of "near or close (to something); adjoining."  A541.

### C. The Trial Court Erred in Granting Summary Judgment to Defendant.

The district court committed reversible errors in granting summary judgment by improperly comparing the construed claims to the accused device and methods, reducing the matter to one of claim construction, and failing to view ICON's evidence, presented in the form of expert testimony and documents, in the light most favorable to ICON because genuine issue(s) of material fact remained. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d at 1302; *Ferring B.V. v. Barr Labs, Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006); *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d at 1325-26.

### 1. The District Court Improperly Compared Defendant's Website with the Construed Claims.

The district court committed reversible error by improperly comparing Defendant's "website" with ICON's claimed server, software, and method. Specifically, the district court erroneously found "that there is no genuine issue of material fact as to whether Travelocity's accused website [*sic*] infringes the '853 patent."  A11, A12.  This finding is erroneous because Defendant's "website" is

26

*not* the infringing device or method. A62-63. This is, however, the sleight-of-hand position that Defendant solicited to and was adopted by the district court. A11-12, A312-13, A320, A822-24, A826.

Instead, throughout this litigation, ICON and its technical expert, Dr. Tewfik, have "made clear that the infringement issue concerns Defendant's making or using of ICON's claimed servers, software, and methods." A8, A822-23. Because the district court improperly compared Defendant's "website" to ICON's claimed server, software, or method to determine infringement, then the district court's comparing constitutes reversible error because genuine issues of material fact remain as to whether a "website" is a server, software, or method for which a reasonable juror could determine otherwise, and, therefore, return a verdict in ICON's favor. *Glaxo Group Ltd. v. TorPharm, Inc.*, 153 F.3d at 1370.

### 2. The District Court Improperly Reduced the Summary Judgment Issue to One of Claim Construction.

The district court's decision to reduce the summary judgment issue to claim construction constitutes reversible error because the district court should have reviewed ICON's evidence in the light most favorable to ICON, the standard ordinarily applied to preclude a grant of summary judgment. *Id.* The district court erroneously reduced to claim construction whether "Travelocity's accused products and services practice the claim limitation 'graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the

27

graphics items having the appearance of storefronts' as construed by the Court to mean "images arranged into a scene resembling an area having businesses, at least some of the images having the look of the front exterior of a business." A12-13, A533. To make its determination of non-infringement, the district court said, "[w]here the parties do not dispute any relevant facts regarding the accused product but disagree over which of two possible meanings of a claim is the proper one, 'the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." A13. Contrary to the district court, however, ICON *did* dispute relevant facts about the accused device's and method's functionality and display in view of the claim construction. A822-26. Hence, the district court fundamentally errs when it nevertheless concludes that parties are "generally in agreement as to the way Travelocity's website [*sic*] functions and is displayed on a remote user's computer monitor" and then determines summary judgment as a matter of claim construction. A12-13.

The *Uniloc* court, however, disavows the district court's decision-making process and distinguishes *Athletic Alternatives* and *General Mills* upon which the district court relied. The *Uniloc* court stated:

> The cases cited by Microsoft involve a procedural posture not present in this case. As this court noted in *International Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1374 (Fed. Cir. 2004), the infringement issue in *General Mills, Inc. v. Hunt–Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997) collapsed into claim construction because "the parties agreed with each other and the district court

28

about how each of two competing claim constructions would apply to the undisputed structure of the accused invention." In other words, the parties conceded that under one claim construction there was infringement and under the other there was none, and were arguing only over which claim construction was appropriate. The infringement issue in *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1372, 1378 (Fed. Cir. 2007) also came to this court with the same posture. *See* 73 F.3d at 1581 ("We conclude that Claim 1 of the ′097 patent includes the limitation that the splay-creating string end offset distance take on at least three values, *i.e.*, a minimum, a maximum, and at least one intermediate value. We thus affirm the district court's conclusion that Claim 1 does not literally read on the Vortex racket."). As discussed below, this case presents the opposite procedural posture; **the claim construction itself is not contested, but the application of that claim construction to the accused device is**. Thus, this court applies the traditional rule for review of jury verdicts of factual issues discussed above.

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d at 1302; A13. For purposes of the

summary judgment before the district court, the claim construction was not

contested. Further, the district court admitted that the parties did contest

application of the claim construction to Defendant's devices and methods. A13.

That is, "ICON and Travelocity disagree about whether the pop-up windows

containing storefront images that appear when a user selects a number in the map

area of the 'Map View' tab meet the limitations of the '853 patent." *Id*. Thus, the

instant case parallels the procedural posture in *Uniloc*. As a result and under this

Circuit's precedent, the district court improperly reduced the summary judgment

issue to one of claim construction, and, in fact, re-construction, rather than

properly reviewing ICON's evidence of infringement in the light most favorable to

ICON. Thus, the framework of the district court's decision-making process is a legal error for which reversal is required. *Glaxo Group Ltd. v. TorPharm, Inc.*, 153 F.3d at 1370.

### 3.   Sufficient Evidence Existed That Warranted Denying Summary Judgment.

Additionally and alternatively, the district court committed reversible error in failing to view ICON's evidence in the light most favorable to ICON before granting summary judgment.   Despite sufficient evidence, the district court rejected the evidence as "conclusory" and "insufficient to create a genuine issue of material fact as to whether this claim limitation is satisfied."   A7-9, A16-18. Specifically, the district court reproved ICON's unchallenged expert, Dr. Tewfik, for not analyzing the code, explaining how the code establishes infringement, or where in the code selection and arrangement instructions for the images can be found.   A17.   ICON respectfully disagrees and shows below that its evidence was neither merely conclusory nor insufficient when viewed in the light most favorable to ICON.

Contrary to Defendant's sole reason for asserting non-infringement, that is, there is "no evidence of infringement by the accused website [*sic*] where the images of storefronts are a subset of the images comprising the commercial area," ICON provided screenshots and an expert declaration showing otherwise.   A6; A828, A830, A832, A894-902.   Screenshots from Defendant's website,

www.travelocity.com, provide evidence of Defendant's infringement of ICON's claims, which require servers generating or enabling but, save its method claim, does *not* actually require displaying what may be seen on the user's monitor. A822-23 (citing Tewfik Report, A2890 ("However, that is not to say, that claim 1 requires the actual depiction of such images, merely that Defendant selects and arranges images for inclusion in a screen visible on the client.")). Nonetheless, in its Response, ICON included three screenshots to show "images of storefronts are a subset of the images comprising the commercial area." A828, A830, A832.

Under an improper reading of the claims, ICON still showed Defendant had what it said was missing for infringement to exist. A827-28. Specifically, and supported by its infringement contentions and an expert report, ICON provided a screenshot labeled "Figure 1" to show that Defendant's servers, software and processes are configured, programmed and operated to generate screen displays of "images of storefronts [that] are a subset of the images comprising the commercial area." *Id*. In Figure 1, three hotel-storefront-pop-up images are displayed within the map portion of a screenshot. *Id*. The district court, however, concluded, as a matter of renewed claim construction, that these images were not within the commercial area, but, instead, "overlaid on top of" the commercial area, and, thus, are not "part" of the commercial area in order to find non-infringement. A14-15. Similarly, the district court also concluded, as a matter of renewed claim

31

construction, that ICON's additional screenshot evidence, namely Figures 2 and 3, presented images in "a list below the map area," which were not "part" of the commercial area in order to find non-infringement.    *Id*., A829-33.    ICON respectfully submits that the district court weighed ICON's evidence, which is improper on a motion for summary judgment, and, furthermore, substituted its decision with a decision properly belonging to a reasonable juror, who could find that Figures 1-3 do show "storefronts are a subset of the images comprising the commercial area" when viewed in the most favorable light to ICON.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial").

Yet further, ICON provided more evidence to show summary judgment was unwarranted.    Dr. Tewfik, chair of the electrical and computer engineering department at The University of Texas, provided controverting evidence, through his declaration and expert report, that also should have precluded summary judgment.  *Ferring B.V. v. Barr Labs, Inc.*, 437 F.3d at 1193; A894-902.  In his declaration, which contrasts with Defendant's positions, Dr. Tewfik states what a person having ordinary skill in the art ("PHOSITA") would understand as to:  (1) what constitutes a "webpage"; (2) where a webpage resides; (3) what a webpage contains (*i.e.*, assembled code and instructions and not what is shown on a

display); and (4) how computer information or code represents images for selection and arrangement on a display. A896-97. Further, and also contrary to Defendant's position, Dr. Tewfik explains how a screenshot does not literally depict a "Map View webpage" on Defendant's server, but that the screenshot does provide evidence of at least some of the content of such a webpage. A897. Instead, images (*i.e.*, storefronts), map, and other items *are* included in the webpage on the server although *not seen* at that location in the particular screenshot selected by Defendant. *Id.* The generation by Defendant's servers of a screen display containing information or code representing "images arranged into a scene resembling an area having businesses," including images having "the look of the front exterior of a business," meets and would be understood by a PHOSITA as meeting the limitations of claims 1, 10 and 11 of the '853 patent requiring a screen display to be generated containing "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts." A900. Finally, Dr. Tewfik explains that, in line with his report and deposition testimony, Defendant would have to modify its computer code so that its servers would not gather or return information or code representing graphics items corresponding to the storefronts images. *Id.*

As a result, Dr. Tewfik's declaration, unsuccessfully struck as new opinion, provides sufficient evidence to show that Defendant is factually incorrect, or, at the

very least, raises a genuine issue of material fact when viewed in the light most favorable to ICON, in Defendant stating as fact that a "*webpage* returned as part of [a user's] search shows a map with business locations[;]" and that "images visible on the [*webpage*] may have the look or appearance of the front of [a] hotel." A10, A12, A13, A314-15. In addition to these disputed facts, and contrary to the district court, it is not correct to look at the screen display as the *sine qua non* evidence of infringement because webpages are not screenshots. A15, A822-23. To that point, infringement occurs by Defendant's servers, software and processes that contain code and instructions that generate screen displays, but which exist on the server as webpages, of "images of storefronts [that] are a subset of the images comprising the commercial area." A306, A822-23. In sum, ICON respectfully requests that the Court reverse the district court's erroneous grant of summary judgment because ICON presented sufficient evidence that was not merely conclusory when viewed in the light most favorable to ICON.

## VIII. CONCLUSION

For these reasons, the judgment of the trial court should be reversed in all aspects, Plaintiff's proposed claim constructions adopted, and the case remanded for further proceedings.

Respectfully Submitted,

June 28, 2013                          *s/Guy Fisher*
                                       Guy Fisher, *Lead Counsel*

34

State Bar No. 07051010
PROVOST✯UMPHREY LAW FIRM,
L.L.P.
490 Park Street
P.O. Box 4905
Beaumont, Texas  77704
Tel:  (409) 835-6000
Fax:  (409) 838-8888
Email:  gfisher@pulf.com

Guy E. Matthews
State Bar No. 13207000
C. Vernon Lawson
State Bar No. 12058150
Matthew C. Juren
State Bar No. 24065530
Erik J. Osterrieder
State Bar No. 24013276
Matthews Lawson PLLC
2000 Bering Drive, Suite 700
Houston, Texas  77057
Tel:  (713) 355-4200
Fax:  (713) 355-9689
Emails:
gmatthews@matthewsfirm.com
vlawson@matthewsfirm.com
mjuren@matthewsfirm.com
ejo@matthewsfirm.com

**ATTORNEYS FOR PLAINTIFF**
**ICON Internet Competence Network**
**B.V.**

# ADDENDUM

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **ICON INTERNET COMPETENCE NETWORK B.V.,** | § § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Civil Action No. 3:11-cv-01131-O** |
| **TRAVELOCITY.COM LP,** | § § § | |
| **Defendant.** | § § § | |

## FINAL JUDGMENT

The Court has issued its order granting Defendant Travelocity.com LP's Second Motion for Summary Judgment of Non-Infringement (ECF No. 130), thereby disposing of all issues pending in this case.

Accordingly, it is **ORDERED, ADJUDGED, and DECREED** that the case is **DISMISSED** with prejudice.

**SO ORDERED** on this **22nd day** of **February, 2013.**


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

A 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **ICON INTERNET COMPETENCE NETWORK B.V.,** | § § § § | |
| **Plaintiff,** | § § | **Civil Action No. 3:11-cv-01131-O** |
| **v.** | § § § | |
| **TRAVELOCITY.COM LP,** | § § § | |
| **Defendant.** | § § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant Travelocity.com LP's ("Travelocity") Second Motion for Summary Judgment of Non-Infringement (ECF No. 130), filed December 18, 2012, Travelocity's Brief in Support of its Second Motion for Summary Judgment of Non-Infringement (ECF No. 130-1), Travelocity's Appendix in Support of its Second Motion for Summary Judgment of Non-Infringement (ECF No. 131); Plaintiff ICON Internet Competence Network B.V.'s ("ICON") Response in Opposition to Travelocity's Second Motion for Summary Judgment of Non-Infringement (ECF No. 141), ICON's Brief in Support of its Response to Travelocity's Second Motion for Summary Judgment of Non-Infringement (ECF No. 142), ICON's Appendix in Support of its Response to Travelocity's Second Motion for Summary Judgment of Non-Infringement (ECF No. 143); and Travelocity's Reply Brief in Support of its Second Motion for Summary Judgment of Non-Infringement (ECF No. 155).

Also before the Court are Travelocity's Motion to Strike the Declaration of Ahmed H. Tewfik (ECF No. 153), filed January 22, 2013, Travelocity's Appendix in Support of its Motion to

Strike Declaration Ahmed H. Tewfik (ECF No. 154), ICON's Response in Opposition to Travelocity's Motion to Strike the Declaration of Ahmed Tewfik (ECF No. 174), ICON's Appendix in Support of its Response in Opposition to Travelocity's Motion to Strike the Declaration of Ahmed H. Tewfik (ECF No. 175), and Travelocity's Reply Brief in Support of its Motion to Strike the Declaration of Dr. Ahmed Tewfik (ECF No. 178).

Having considered the motions, the related briefing, the record in this case, and the applicable law, the Court finds that Travelocity's Motion to Strike the Declaration of Ahmed H. Tewfik (ECF No. 153) should be and is hereby **DENIED**, and Travelocity's Second Motion for Summary Judgment of Non-Infringement (ECF No. 130) should be and is hereby **GRANTED**.

## I.    BACKGROUND

Plaintiff ICON is the owner by assignment of U.S. Patent No. 6,002,853 (the "'853 patent"), entitled "System for Generating Graphics in Response to a Database Search," which generally relates to "systems including databases," "systems including displays for displaying the results of a database search," and "computer networks." U.S. Patent No. 6,002,853 col.1 l.11–14 (filed Oct. 26, 1995). On May 27, 2011, ICON sued Travelocity for patent infringement in federal district court. *See generally* Compl., ECF No. 1. In its complaint, ICON alleges that Travelocity "has been and/or is now directly infringing one or more claims of the '853 patent by making, using, selling, and/or offering for sale products and/or services that fall within the scope of at least one claim of the '853 patent, including the searching services provided through the Travelocity website having a URL of http://www.travelocity.com." *Id.* ¶ 9. ICON asserts independent claims 1, 10, and 11 of the '853 patent against Travelocity, as well as dependent claims 2–7.

Claim 1 of the '853 patent requires:

2

A 3

> A server configured to communicate with a client that selectively connects to the server, the server comprising:
>
> a memory, and a database defined in the memory, the database including data about businesses, which data includes at least the names of respective businesses and categories in which respective businesses are classified;
>
> communication hardware providing for communication between the server and the client;
>
> the server communicating to the client an interface for use in requesting a search of the database in response to a client connecting to the server, the server, in response to a search request made using the interface, searching the database and generating a screen display for the client, the screen display varying depending on the results of the search and including graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts, respective graphics items being associated with respective businesses, multiple storefronts of the screen display being associated with businesses of the same category depending on the search request, the screen display being navigable to reveal graphics items adjacent to those that are displayed, the selection of individual graphics items for inclusion in the screen display varying depending on the results of the search.

U.S. Patent No. 6,002,853 col.10 l.24–48 (filed Oct. 26, 1995). Independent claim 10 requires a "memory bearing software to be executed by a server" that allows the server to communicate with a client, and independent claim 11 requires a particular "method" of communicating with a client. *See id.* col.11 l.9 to col.12 l.26. Independent claims 10 and 11 both include essentially the same limitations as independent claim 1. *See generally id.* Dependent claims 2–7 each require "[a] server in accordance with claim 1." *See id.* col.10 l.49 to col.11 l.2.

Each of the asserted claims contains the "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" limitation. *See* U.S. Patent No. 6,002,853 col.10 l.37–40, col.11 l.21–24, col.12 l.15–18 (filed Oct. 26, 1995). The Court construed this phrase as "images arranged into a scene resembling

3

A 4

an area having businesses, at least some of the images having the look of the front exterior of a business." Claim Construction Order 18, May 1, 2012, ECF No. 55.

Travelocity controls and operates one or more web servers that it uses to provide the website http://www.travelocity.com. Def.'s Br. Supp. 2d Mot. Summ. J. Non-Infringement 2, ECF No. 130-1. Users can access the website through the Internet using an internet browser. *Id.* Once a user connects to Travelocity's servers through http://www.travelocity.com, Travelocity transmits to the user a web page with a search interface for flights, hotels, car rentals, or vacation packages. *Id.* The user inputs his particular search parameters, and the server searches through Travelocity's databases to generate a web page containing the results of the search and instructions for the user's computer to display the results. *Id.* at 3. The images included in the search results depend on the parameters of the user's search. *Id.* The results web page that Travelocity's servers return has separate tabs labeled "List View," "Map View," and "Top Secret Hotels." *Id.* When the user selects the "Map View" tab, Travelocity's servers direct him to a separate web page that instructs the user's computer to display a map of the geographical area of the search; a list of hotels with associated graphics, usually images of the exterior of the hotels; advertisements; and information related to the user's search criteria. *Id.* The web page causes a user's computer to display a map with business locations indicated by numbered boxes. *Id.*; *see* Pl.'s Br. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement 15 (Fig.2), ECF No. 142. When the user selects one of the numbered boxes, a pop-up window appears in the map area that contains an image of the front of the hotel that can be found at that location with a line drawn to the approximate location of the hotel on the map. *See* Pl.'s Br. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement 16, 17 (Fig.3), ECF No. 142. This "Map View" tab is the focus of Travelocity's second motion for summary judgment.

4

On July 23, 2012, Travelocity filed its first motion for summary judgment of non-infringement, asserting that its website lacks the "multiple storefronts of the screen display being associated with businesses of the same category depending on the search request" limitation, which is required by all asserted claims. *See* Def.'s Mot. Summ. J. Non-Infringement 1, ECF No. 58. ICON responds that Travelocity is not entitled to summary judgment because Travelocity's accused products and services practice this limitation and, at the very least, there is a genuine issue of material fact. *See* Pl.'s Br. Supp. Resp. Travelocity's Mot. Summ. J. Non-Infringement 2, ECF No. 67.  On December 18, 2012, Travelocity filed its second motion for summary judgment of non-infringement, asserting that its website lacks the "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" limitation, which is required by all asserted claims. *See* Def.'s 2d Mot. Summ. J. Non-Infringement 1–2, ECF No. 130.  ICON responds that Travelocity is not entitled to summary judgment because Travelocity's accused products and services practice this limitation and, at the very least, there is a genuine issue of material fact. *See* Pl.'s Br. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement 5–6, ECF No. 142.  The parties have fully briefed the issues, and this matter is ripe for determination.  Because the Court finds that Travelocity's second motion for summary judgment of non-infringement should be granted, the Court finds it unnecessary to address the merits of Travelocity's first motion for summary judgment.  The Court will first address the merits of Travelocity's Motion to Strike the Declaration of Ahmad H. Tewfik (ECF No. 153) before addressing the merits of Travelocity's Second Motion for Summary Judgment of Non-Infringement (ECF No. 130).

## II.    MOTION TO STRIKE

On January 22, 2013, Travelocity filed its Motion to Strike the Declaration of Ahmed H. Tewfik (ECF No. 153), asserting that the declaration of Ahmed H. Tewfik, Sc.D. ("Dr. Tewfik"), attached as exhibit five of ICON's Appendix in Support of its Response to Travelocity's Second Motion for Summary Judgment of Non-Infringement (ECF No. 143), contains "new expert opinions of infringement that have never before been disclosed." Def.'s Mot. Strike Decl. Tewfik 1, ECF No. 153. Travelocity contends that the following opinions were disclosed for the first time in Dr. Tewfik's declaration: (1) Travelocity's servers generate a screen display containing information or code representing "images arranged into a scene resembling an area having businesses," including images having "the look of the front exterior of a business," as evidenced by a screenshot of the "map view" tab of Travelocity's website where pop-up windows with hotel information are included in the map area, even though the storefront images may not be initially visible to the client; and (2) because of the distinction between the web page on Travelocity's server and what is actually seen on a user's monitor, Travelocity could not avoid infringement by preventing a user at a client computer from seeing on a remote monitor the storefront images selected by Travelocity's server; rather, Travelocity would have to modify its computer code to prevent its servers from gathering and returning information or code representing graphics items that correspond to the storefront images of hotels. *Id.* at 2–3. Travelocity contends that the distinction between the capabilities of the code at the server level and what is visible on a screen display "does not appear in Dr. Tewfik's preliminary expert report as a basis for how Travelocity has 'graphics items having the appearance of storefronts' within the 'commercial area.'" *Id.* at 3. Travelocity urges the Court to strike Dr. Tewfik's declaration because "ICON has no basis for changing its infringement theory again at this

6

A 7

late stage in the litigation," and "Travelocity would be severely prejudiced in its preparation for trial if ICON were allowed to supplement its infringement expert opinions." *Id.* at 4.

ICON argues that Dr. Tewfik's declaration does not contain any new expert opinions, because "throughout this litigation, Dr. Tewfik has made clear that the infringement issue concerns Defendant's making or using of ICON's claimed servers, software, and method." Pl.'s Resp. Opp'n Travelocity's Mot. Strike Decl. Tewfik 2, ECF No. 174. ICON asserts that the distinction between "capabilities of the code at the server and what is visible on the screen display" is not "obscure"; rather, "the distinction is unambiguous and real as screenshots only evidence infringement of ICON's systems and methods." *Id.*

Federal Rule of Civil Procedure 26 requires a party utilizing an expert to submit an expert report containing "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Rule 16(b) authorizes federal courts to control the discovery process through a scheduling order, which may include setting deadlines for designating experts and filing expert reports. Fed. R. Civ. P. 16(b). "Rule 37(b)(2)(B) authorizes the district court to impose sanctions on a disobedient party by refusing to allow that party to introduce designated matters into evidence." *Barrett v. Atl. Richfield Co.*, 95 F.3d 375, 380 (5th Cir. 1996); Fed. R. Civ. P. 37(b)(2)(B). A court may properly exclude expert opinions that are not timely disclosed after examining four factors:

> (1) the explanation, if any, for the party's failure to comply with the discovery order;
> (2) the prejudice to the opposing party of allowing the witnesses to testify;
> (3) the possibility of curing such prejudice by granting a continuance; and
> (4) the importance of the witnesses' testimony.

*Barrett*, 95 F.3d at 380.  Before analyzing these four factors, the Court must determine if the opinions included in Dr. Tewfik's declaration constitute new, untimely expert opinions.

Travelocity contends that Dr. Tewfik's reliance on the pop-up windows in the map area to prove that Travelocity's servers satisfy the claim limitation "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" is a newly disclosed expert opinion. Def.'s Reply Br. Supp. Mot. Strike Decl. Tewfik 1, ECF No. 178.  ICON argues, and the Court agrees, that Dr. Tewfik's reliance on the pop-up windows to prove infringement is consistent with Dr. Tewfik's previously disclosed opinions, which focus on the capabilities of Travelocity's servers as merely evidenced by various screenshots.  *See* Pl.'s Resp. Opp'n Travelocity's Mot. Strike Decl. Tewfik 8, ECF No. 174; Pl.'s App. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement Ex. 7 (Tewfik Dep.) 127:1–12, 137:15–138:16, 51:1–52:3, at App. 339, 342, 320, ECF No. 143; *id.* Ex. 6 (Tewfik Prelim. Expert Report) ¶¶ 24, 25, 46–65, at App. 69, 75–95.  Additionally, ICON's Final Infringement Contentions specifically describe the pop-up windows that appear in the map area when explaining its theory of how Travelocity's website infringes the "at least some of the graphics items having the appearance of storefronts" limitation.  Def.'s App. Supp. Mot. Summ. J. Non-Infringement Ex. H (Pl.'s Disclosure Asserted Claims & Final Infringement Contentions), at App. 97, ECF No. 60-8.  Therefore, the Court finds that Dr. Tewfik's declaration does not contain any newly disclosed expert opinions and need not be stricken.  Furthermore, even if Dr. Tewfik's declaration did qualify as a newly disclosed expert opinion, given the non-technical nature of Dr. Tewfik's reliance on the pop-

up windows to prove that Travelocity's servers satisfy the disputed claim limitation, the Court finds that Travelocity will not be prejudiced by the Court's consideration of the declaration.

Accordingly, the Court finds that Travelocity's Motion to Strike the Declaration of Ahmed H. Tewfik (ECF No. 153) should be and is hereby **DENIED**. The Court will now address the merits of Travelocity's Second Motion for Summary Judgment of Non-Infringement (ECF No. 130).

## III.    LEGAL STANDARD

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c).

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323–24. To carry this burden, the "opponent must do more than simply show . . . some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 249. Neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian*

*v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). Summary judgment in favor of the Defendant is proper if, after adequate time for discovery, the Plaintiff fails to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23.

When weighing the evidence on a motion for summary judgment, the court must decide all reasonable doubts and draw all reasonable inferences in favor of the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. As long as there appears to be some support for the disputed allegations such that "reasonable minds could differ as to the import of the evidence," the motion for summary judgment must be denied. *Id.* at 250.

## IV.    ANALYSIS

In its second motion for summary judgment, Travelocity argues that it is entitled to summary judgment of non-infringement because its accused website does not practice the express claim limitation of "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" either literally or under the doctrine of equivalents. Def.'s Br. Supp. 2d Mot. Summ. J. Non-Infringement 8, 9, ECF No. 130-1. ICON responds that Travelocity's accused website practices this limitation of the asserted claims, or, at the very least, there is a genuine issue of material fact. Pl.'s Br. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement 12, ECF No. 142. For the reasons set forth below, the Court finds

that there is no genuine issue of material fact as to whether Travelocity's accused website infringes the '853 patent either literally or under the doctrine of equivalents, and Travelocity is entitled to summary judgment of non-infringement.

### A.    Literal Infringement

ICON and Travelocity are generally in agreement as to the way Travelocity's website functions and is displayed on a remote user's computer monitor. When a user inputs his particular search parameters into the search interface, Travelocity's server searches through Travelocity's databases to generate a web page containing the results of the search and instructions for the user's computer to display the results. Def.'s Br. Supp. 2d Mot. Summ. J. Non-Infringement 3, ECF No. 130-1. The results web page has separate tabs labeled "List View," "Map View," and "Top Secret Hotels." *Id.* When the user selects the "Map View" tab, Travelocity's servers direct him to a separate web page that instructs the user's computer to display a map of the geographical area of the search with a list of hotels below the map area. *Id.* The hotels in the list are accompanied by graphics, which are usually images of the exterior of the hotels. *Id.* The map area contains numbered boxes indicating the approximate locations of the hotels. *Id.*; *see* Pl.'s Br. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement 15 (Fig.2), ECF No. 142. When the user selects one of the numbered boxes, a pop-up window appears in the map area that contains an image of the front of the hotel that can be found at that location with a line drawn to the approximate location of the hotel on the map. *See* Pl.'s Br. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement 16, 17 (Fig.3), ECF No. 142. ICON and Travelocity disagree as to whether these facts establish that Travelocity's accused products and services practice the claim limitation "graphics items arranged

11

A 12

to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" as construed by the Court.

Where the parties do not dispute any relevant facts regarding the accused product but disagree over which of two possible meanings of a claim is the proper one, "the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." *Athletic Alts., Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir. 1996); *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1378 (Fed. Cir. 2007); *Gen. Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997) (citing *Athletic Alts.*, 73 F.3d at 1578). Here, ICON and Travelocity disagree about whether the pop-up windows containing storefront images that appear when a user selects a number in the map area of the "Map View" tab meet the limitations of the '853 patent. Because this issue is one of claim construction, the Court may resolve it at the summary judgment stage. Accordingly, the Court now turns to the issue of literal infringement.

"A finding of literal infringement requires that the asserted claims, as properly construed, read on the accused product." *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1468 (Fed. Cir. 1993). A claim covers or reads on an accused device "if the device embodies every limitation of the claim, either literally or by [a substantial] equivalent." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993). "Literal infringement is found where the accused device falls within the scope of the asserted claims as properly interpreted." *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 547 (Fed. Cir. 1994). "For literal infringement, each limitation of the claim must be met by the accused device exactly, any deviation from the claim precluding a finding of infringement." *Id.*

The '853 patent requires a server "generating a screen display for the client, the screen display . . . including graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts." U.S. Patent No. 6,002,853 col.10 l.31–40 (filed Oct. 26, 1995). The Court has determined that "generating a screen display" means "selecting and arranging images for inclusion in a screen visible on the client." Claim Construction Order 12, 27, May 1, 2012, ECF No. 55. The Court has determined that "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" means "images arranged into a scene resembling an area having businesses, at least some of the images having the look of the front exterior of a business." *Id.* at 18, 27. Therefore, the '853 patent requires a server that selects and arranges images "for inclusion in a screen visible on the client," and the screen visible on the client must include "images arranged into a scene resembling an area having businesses, at least some of the images having the look of the front exterior of a business." The Court has also concluded that it is consistent with the claim language to require that the storefront images be a subset of the commercial area. *Id.* at 18. In other words, some of the "images arranged into a scene resembling an area having businesses" must be "images having the look of the front exterior of a business."

Travelocity argues that its website lacks the claim limitation "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts," because the "Map View" tab of the website's search results page contains a map at the top (the "commercial area") and a list of hotels with associated images of the front exteriors of the businesses (the "graphics items having the appearance of storefronts")

13

below the map area. Def.'s Br. Supp. 2d Mot. Summ. J. Non-Infringement 8–9, ECF No. 130-1.

Travelocity has included screenshots depicting what is displayed on a remote user's monitor when

he accesses the "Map View" tab of Travelocity's website. *Id.* at 7, 8. Because the "graphics items

having the appearance of storefronts" are not included within the "commercial area," Travelocity

contends that its products and services do not practice the disputed claim limitation. *Id.*

Furthermore, Travelocity argues that the pop-up windows containing hotel images that appear in the

map area when a user selects a numbered box do not meet the claim limitation because the pop-up

windows are not a subset of the map. Def.'s Reply Br. Supp. 2d Mot. Summ. J. Non-Infringement

7, ECF No. 155; *see* Pl.'s Br. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement 17

(Fig.3), ECF No. 142. The pop-up windows are overlaid *on top* of the map, and the hotel images

in the pop-up windows are not part of the "scene resembling an area having businesses." *Id.* at 7–8.

In response, ICON argues that the storefront images that appear in the pop-up windows when a user

selects a numbered box in the map area satisfy the disputed claim limitation because they appear in

the same area of the screen as the map of the geographical area. Pl.'s Br. Supp. Resp. Travelocity's

2d Mot. Summ. J. Non-Infringement 12, 13 (Fig.1), 16, 17 (Fig.3), ECF No. 142. The Court agrees

with Travelocity's analysis of the claim limitation.

As stated previously, the language of the patent claims focuses on what is included in the

screen display, which the Court has construed as "a screen visible on the client." *Id.* at 27.

Therefore, it is appropriate to analyze the screenshots that depict what is displayed on a remote user's

computer monitor. On the "Map View" area of Travelocity's website, a remote user's monitor

displays the storefront images either in a list *below* the map area or in a pop-up window overlaid *on*

*top of* the map area. The storefront images in the list and the storefront images in the pop-up

14

A 15

windows are not part of the images "arranged into a scene resembling an area having businesses" and therefore do not satisfy the disputed claim limitation. Thus, Travelocity is entitled to summary judgment of non-infringement because its accused products and services do not literally practice the "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" claim limitation.

ICON contends that the infringement analysis should focus on Travelocity's accused servers and software and the process performed by their operation, not on what may be displayed on a remote user's screen at any given point in time. Pl.'s Br. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement 7–8, ECF No. 142. As a result, ICON argues that screenshots representing what is displayed on a remote user's monitor at a specific point in time are not determinative, but merely provide evidence of what Travelocity's servers are capable of doing. *Id.* ICON argues that the computer information or code assembled by Travelocity's servers for determining what will be seen on a remote user's monitor contains the disputed claim limitation, regardless of what is actually displayed on the remote user's monitor, as evidenced by screenshots. *Id.* at 8. ICON relies on the code assembled by Travelocity's servers to establish infringement of the '853 patent, but ICON never provides any explanation of how the provided code establishes infringement. *See, e.g.*, Pl.'s App. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement Ex. 6 (Tewfik Prelim. Expert Report) ¶ 55, at App. 80–82, ECF No. 143. In his preliminary expert report, Dr. Tewfik explains that HTML or "HyperText Markup Language" provides instructions to a user's computer regarding how to render the web page and search results returned from a search of Travelocity's databases, how to arrange the images to be displayed along with other information on a user's computer monitor, and how to retrieve and display advertisements to the user. *Id.* However, Dr. Tewfik never specifically

analyzes the provided code or explains in detail where the disputed claim limitation can be found in the code. *See generally id.* Without any accompanying explanation, it is unclear how the code establishes that Travelocity's accused products and services infringe the '853 patent.

Similarly, in his deposition Dr. Tewfik relies on Travelocity's web page code and states that his infringement theories are based on what Travelocity's servers are capable of doing, not what is actually rendered on a remote user's monitor. Pl.'s App. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement Ex. 7 (Tewfik Dep.), at 44:5–17, 45:5–7, 51:8–52:3, at App. 318, 319, 320. However, Dr. Tewfik never specifically analyzes the code or explains how the code establishes that Travelocity's accused products and services infringe the '853 patent. *See generally id.* The same is true of Dr. Tewfik's declaration, which ICON provided with its response to Travelocity's second motion for summary judgment. *See* Pl.'s App. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement Ex. 5 (Tewfik Decl.) ¶8, at App. 54–55, ECF No. 143. Dr. Tewfik simply states in a conclusory fashion: "The computer information or code for what Travelocity describes as its 'Map View webpage' includes information or code for 'images arranged into a scene resembling an area having businesses, at least some of the images having the look of the front exterior of a business.' By means of such information or code, Travelocity selects and arranges the images for inclusion in a screen visible on a remote or 'client' computer." *Id.* Dr. Tewfik does not explain where in the code this information can be found. *Id.* ¶¶ 9–10. Such conclusory allegations are insufficient to create a genuine issue of material fact to overcome a motion for summary judgment. *See Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1193 (Fed. Cir. 2006).

In conclusion, the various screenshots depicting what is displayed on a remote user's computer monitor on the "Map View" area of Travelocity's website indicate that the "storefront

16

A 17

images" in the list and the storefront images in the pop-up windows are not part of the images "arranged into a scene resembling an area having businesses." Therefore, Travelocity is entitled to summary judgment of non-infringement because its accused products and services do not literally practice the "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" claim limitation. The testimony of ICON's expert, Dr. Tewfik, and the attached copies of Travelocity's web page code are insufficient to create a genuine issue of material fact as to whether this claim limitation is satisfied.

## B.    Doctrine of Equivalents

Travelocity argues that it is entitled to summary judgment of non-infringement under the doctrine of equivalents because ICON has failed to produce any evidence that would support a finding of infringement under this theory. Def.'s Br. Supp. 2d Mot. Summ. J. Non-Infringement 9, ECF No. 130-1; Def.'s Reply Br. Supp. Mot. Summ. J. Non-Infringement 11, ECF No. 155. ICON does not address the doctrine of equivalents in its response to Travelocity's second motion for summary judgment. *See generally* Pl.'s Br. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement, ECF No. 142. The Court finds that ICON has failed to meet its burden of presenting sufficient evidence to establish that there is a genuine issue of material fact for trial with respect to the application of the doctrine of equivalents.

"If an asserted claim does not literally read on an accused product, infringement may still occur under the doctrine of equivalents if there is not a substantial difference between the limitations of the claim and the accused product." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1250–51 (Fed. Cir. 2000) (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 39–41 (1997)). "A finding of infringement under the doctrine of equivalents requires a showing that

the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method." *AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1326 (Fed. Cir. 2007); *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1371 (Fed. Cir. 2000).

ICON, as the plaintiff in the present case, has the burden to prove infringement under the doctrine of equivalents by a preponderance of the evidence. *See AquaTex Indus., Inc.*, 479 F.3d at 1328. To create a genuine issue of material fact and survive summary judgment, a patent holder must "provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents." *Id.* "Such evidence must be presented on a limitation-by-limitation basis." *Id.* When a patent holder relies on the doctrine of equivalents, it must present "the particularized testimony of a person of ordinary skill in the art, typically a qualified expert, who (on a limitation-by-limitation basis) describes the claim limitations and establishes that those skilled in the art would recognize the equivalents." *Id.* at 1329.

In the present case, ICON has set forth its final infringement contentions as required by Miscellaneous Order No. 62 §§ 3-1 and 3-6(a). *See* Def.'s App. Supp. Mot. Summ. J. Non-Infringement Ex. H (Pl.'s Disclosure Asserted Claims & Final Infringement Contentions), at App. 77–189, ECF No. 60-8. ICON's final infringement contentions include a chart that explains ICON's arguments with respect to each limitation of claims 1–7, 10, and 11 of the '853 patent. Each section

of the chart, which corresponds to each limitation of claims 1–7, 10 and 11 of the '853 patent, contains the following language:

> Alternatively, to the extent Travelocity contends, or the Court or jury finds, that this element is not literally present in the accused server, ICON contends that any limitation not found to be literally present or performed is equivalently provided or performed, representing infringement under the doctrine of equivalents, in that, as described herein, the differences between the claimed and accused server are only insubstantial and/or because Travelocity's server, as described herein, includes substantially the same function performed in substantially the same way, to achieve substantially the same result as the requirement of the claim.

*Id.* at App. 81. This boilerplate language does not satisfy ICON's burden of presenting particularized expert testimony of a person of ordinary skill in the art that describes the claim limitations and establishes that those skilled in the art would recognize the equivalents. *See AquaTex Indus., Inc.*, 479 F.3d at 1329.

ICON has provided the preliminary expert report, two declarations, and deposition of Dr. Tewfik to support its infringement contentions. *See* Pl.'s App. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement Ex. 6 (Tewfik Prelim. Expert Report), at App. 61–307, ECF No. 143; Pl.'s App. Supp. Resp. Travelocity's Mot. Summ. J. Non-Infringement Ex. 4 (Tewfik Decl.), at App. 35–104, ECF No. 68; Pl.'s App. Supp. Resp. Travelocity's 2d Mot. Summ. J. Non-Infringement Ex. 5 (Tewfik Decl.), at App. 52–60, ECF No. 143; *id.* Ex. 7 (Tewfik Dep.), at App. 308–48. However, nowhere in any of these documents does Dr. Tewfik specifically address equivalents on a limitation-by-limitation basis, explain the insubstantiality of the differences between the patented system and the accused system, or discuss the function, way, result test. ICON presented Dr. Tewfik's testimony for purposes of establishing literal infringement; the testimony does not purport to and therefore is

insufficient to establish infringement under the doctrine of equivalents.  *See Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996); *Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989) ("The evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement.").  Therefore, the Court finds that ICON has failed to meet its evidentiary burden of presenting particularized expert testimony of a person of ordinary skill in the art that describes the claim limitations and establishes that those skilled in the art would recognize the equivalents.  Accordingly, Travelocity is entitled to summary judgment that its accused products and services do not practice the "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" limitation under the doctrine of equivalents.

Alternatively, Travelocity argues that it does not infringe under the "all equivalents" or "all limitations" rule, which requires that the doctrine of equivalents be applied to the individual elements of the claim, rather than the invention as a whole, so that no individual elements are effectively eliminated during the course of the equivalents analysis. Def.'s Br. Supp. 2d Mot. Summ. J. Non-Infringement 10–11, ECF No. 130-1.  Travelocity contends that any theory of equivalence would effectively vitiate the particular claim element of "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts." *Id.* at 12.  Because the Court has found that ICON failed to meet its burden of presenting sufficient evidence to establish that there is a genuine issue of material fact for trial with respect to the application of the doctrine of equivalents, there is no need for the Court to address this argument.

## V.    CONCLUSION

For the foregoing reasons, it is **ORDERED** that Travelocity's Motion to Strike the Declaration of Ahmed H. Tewfik (ECF No. 153) is hereby **DENIED**, and Travelocity's Second Motion for Summary Judgment of Non-Infringement (ECF No. 130) is hereby **GRANTED**.

It is further **ORDERED** that the following motions are **DENIED as moot**: Travelocity's First Motion for Summary Judgment of Non-Infringement (ECF No. 58), ICON's Motion to Strike Defendant's Expert Testimony and Reports (ECF No. 124), Travelocity's Motion to Exclude Opinion of Plaintiff's Damages Expert, Mr. Paul Benoit (ECF No. 127), Traveolocity's Motion for Clarification of Trial Setting (ECF No. 165), ICON's Motion in Limine (ECF No. 171), and Travelocity's Disputed Motions in Limine (ECF No. 172).

**SO ORDERED** on this **22nd day** of **February, 2013**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

A 22

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **ICON INTERNET COMPETENCE NETWORK B.V.,** | § § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § | **Civil Action No. 3:11-cv-1131-O** |
| **TRAVELOCITY.COM LP,** | § § | |
| **Defendant.** | § § § | |

**CLAIM CONSTRUCTION ORDER**

Before the Court are Plaintiff Icon Internet Competence Network B.V.'s ("ICON") Opening Claim Construction Brief and Appendix in Support (ECF Nos. 46-47); Defendant Travelocity.com LP's ("Travelocity") Opening Claim Construction Brief and Appendix in Support (ECF Nos. 44-45); ICON's Responsive Claim Construction Brief (ECF No. 51); and Travelocity's Responsive Claim Construction Brief (ECF No. 50).

**I.    BACKGROUND**

U.S. Patent No. 6,002,853 (the "'853 Patent") provides for a virtual reality Yellow Pages system that creates a graphical depiction of a series of business storefronts through which the viewer can navigate to obtain information about the respective businesses. *See generally* U.S. Patent No. 6,002,853 (filed Dec. 14, 1999) [hereinafter "'853 Patent"]. The parties have presented to the Court for construction nine terms in the '853 Patent: (1) "category"; (2) "categories in which respective businesses are classified"; (3) "generating a screen display"; (4) "cause a screen display to be

1

generated for the client"; (5) "graphics items arranged to provide the appearance of at least part of

a commercial area, at least some of the graphics items having the appearance of storefronts"; (6)

"multiple storefronts of the screen display"; (7) "appearance of respective storefronts"; (8)

"respective graphics items being associated with respective businesses"; and (9) "screen display

being navigable to reveal graphics items adjacent those that are displayed." *See generally* Pl.'s

Opening Claim Construction Br., ECF No. 46; Def.'s Opening Claim Construction Br., ECF No. 44.

The Court held a hearing on May 1, 2012 to allow the parties to present their proposed constructions

to the Court. *See* Minute Entry, May, 1, 2012, ECF No. 54. The Court's adopted construction of

the disputed claim terms are explained below.

## II.    LEGAL STANDARDS - PATENT CLAIM CONSTRUCTION

Patent infringement is the unauthorized making, using, selling, offering to sell, or importing

into the United States of any patented invention during the term of the patent. 35 U.S.C. § 271(a).

In a patent infringement case, a court first determines the proper construction of the patent claims

by establishing, as a matter of law, the scope and boundaries of the subject matter of the patent.

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S.

370, 384-85 (1996). Second, the trier of fact compares the properly construed claims to the allegedly

infringing device(s) and determines whether there has been an infringement. *Id.* The issue before

the Court is the proper construction of certain disputed claims in the '853 Patent.

The claims of a patent are the numbered paragraphs at the end of the patent that define the

scope of the invention, and thus the scope of the patentee's right to exclude others from making,

using, or selling the patented invention. *See Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333,

1335-36 (Fed. Cir. 2004). Claim construction is the process of giving proper meaning to the claim

language, thereby defining the scope of the protection. *See Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 619 (Fed. Cir. 1995).

Claim construction starts with the language of the claim itself, since a patent's claims "define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). "The claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. Moreover, claim terms should be given their ordinary and customary meaning as understood by a person of ordinary skill in the art as of the effective filing date of the patent application. *Id.* at 1313. This is because a patent is addressed to, and intended to be read by, others skilled in the particular art. *Id.* However, the patentee is free to define his own terms, so long as any special definition given to a term is clearly defined in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).

When construing disputed claim terms, the court should look first to the intrinsic record of the patent, including the claims and the specification, to determine the meaning of words in the claims. *Nazomi Commc'ns., Inc. v. Arm Holdings, PLC*, 403 F.3d 1346, 1368 (Fed. Cir. 2005). "The specification is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. The specification acts as a dictionary when it expressly or implicitly defines terms. *Id.* at 1321. Courts should also refer to the prosecution history if it is in evidence. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). The prosecution history is part of the intrinsic record and consists of a complete record of all proceedings before the United States Patent and Trademark Office ("PTO"), including prior art cited during the examination of the patent and express representations made by the applicant as to the scope of the claims. *Id.*

3

The Federal Circuit has also stated that district courts may "rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (internal quotation marks omitted). Dictionaries and treatises can be "useful in claim construction[,]" particularly technical dictionaries which may help the court "to better understand the underlying technology and the way in which one of skill in the art might use the claim terms." *Id.* at 1318 (internal quotation marks omitted). As to expert testimony, the Federal Circuit has stated:

> [E]xtrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field.

*Id.* However, "a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Id.* (internal quotation marks omitted). Extrinsic evidence is less significant than the intrinsic record, and undue reliance on it may pose a risk of changing the meaning of claims, contrary to the public record contained in the written patent. *Id.* at 1317-19.

## III.   CLAIM CONSTRUCTION

### 1.   "category"

ICON argues that "category" should be given its plain and ordinary meaning of "a class or division in a scheme of classification," as defined by Webster's New World College Dictionary, since neither the claims nor the specification attribute any special meaning to the term beyond its

4

ordinary usage. Pl.'s Opening Claim Construction Br. 5, 8, ECF No. 46. Travelocity argues, by

contrast, that the patentee deliberately narrowed the meaning of the term "category" to refer only to

a "type of good or service," by specifically providing for a narrowed definition in the specification.

Def.'s Opening Claim Construction Br. 9, ECF No. 44. ICON responds that the "types of goods or

services that a business provides are just one way to categorize a business," and that the term

"category" refers to a more general type of classification. Pl.'s Opening Claim Construction Br. 7-8,

ECF No. 46.

The Federal Circuit has made clear that while the words of a claim are generally given their

ordinary and customary meaning, "the specification may reveal a special definition given to a claim

term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d

at 1313, 1316. "In such cases, the inventor's lexicography governs." *Id.* at 1316 (Fed. Cir. 2005)

(citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). To act as his

own lexicographer, however, the patentee "must 'clearly set forth a definition of the disputed claim

term' other than its plain and ordinary meaning." *Thorner v. Sony Computer Entm't Am. LLC*, No.

2011-1114, 2012 WL 280657, at *2 (Fed. Cir. Feb. 1, 2012) (citing *CCS Fitness, Inc.*, 288 F.3d at

1366).

In the Summary of the Invention, the applicant states that "a system has been described which

provides for presentation of Yellow Pages information in a more appealing format." '853 Patent

col.10 ll.11-13. Then, in the Background of the Invention, the applicant explains how the Yellow

Pages is a directory, developed more than eighty years ago, that "contains information about

businesses categorized by headings." *Id.* col.1 ll.19-21. The specification then states that "[t]he

categories are *defined* by type of product or service sold by the various businesses." *Id.* col.1 ll. 21-

5

22 (emphasis added).  The specification again addresses, in the Summary of the Invention, what

constitutes a "category":

> In one embodiment, the interface is particularly suited for searching
> for businesses, and provides for searching at least by category (type
> of goods or services).   In alternative embodiments, the interface
> provides for searching of any desired field selected from a plurality
> of fields, such as category (type of goods or services), location, phone
> number, zip code, area code, subcategory (e.g. type of cuisine–Pizza,
> German, Vietnamese, Chinese), [and] sublocation (Eastside, North,
> Suburbs, etc.).

*Id.* col.8 ll.19-28.  Further, the patentee provides examples of "goods or services" including car

dealers, restaurants, and furniture stores, *see id.* col.3 ll.55-65, which are identified as examples of

categories in Figures 5, 6, and 10, *see id.* figs. 5, 6, 10.

ICON argues that the patent prosecution history supports a broader construction.  Pl.'s

Opening Claim Construction Br. 6, ECF No. 46.  In response to a PTO office action, the patentee

attempted to distinguish prior art by explaining that an advantage of the patentee's invention is that

it "allows groups of business of the same type (category) to be grouped together."  App. Pl.'s

Opening Claim Construction Br. (Resp. to Office Action of May 18, 1998) 8, at App. 99, ECF No.

47-2. The patentee further explained that this aspect of the invention provided a benefit because

"businesses that are located next to other businesses that sell similar goods or services see an

increase in traffic because the customer who is interested in a particular good or service can more

easily comparison shop or locate hard to find goods or services." *Id.* The patentee provided an

example of the grouping of such businesses, stating that "[f]or example, if the search request

specified restaurants . . . multiple storefronts of the screen display . . . would be associated with

restaurants." *Id.* at App. 98.  Accordingly, contrary to what ICON suggests, the prosecution history

6

A 521

lends additional support to a finding that the patentee specifically defined "category" in a way that narrowed the plain and ordinary meaning of the term.

ICON's most compelling argument for a broad construction of the term "category" is the existence of an additional limitation in Claim 5. *See* '853 Patent col.10 ll.62-64. Claim 5 states that the data in the database described in Claim 1 "further includes the goods or services provided by the business." *See id.* ICON argues that this additional limitation in dependent Claim 5 makes clear that the patentee did not redefine the term "category" to mean something less than the full scope of its ordinary meaning. Pl.'s Responsive Claim Construction Br. 7, ECF No. 51. Indeed, the Federal Circuit has held that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1314-15. Claim 1 claims "a database including data about businesses, which data includes at least the names of respective businesses and categories in which respective businesses are classified . . . . " *See* '853 Patent col.10 ll.26-28. Thus, it would seem that the term "category" could not itself encompass goods or services. Yet, even a broad construction of the term "category," as proposed by ICON, would include the possibility of a categorization by type of good or service, among other types of categorizations. As such, it appears that information relating to "*the* goods or services provided by the business," as claimed in Claim 5, could be provided in the database while still allowing the businesses to be identified by a "*type* of good or service," consistent with the definition of "category" provided by the specification and supported in the prosecution history. Indeed, information relating to "the goods or services provided by the business," as claimed in Claim 5, could conceivably include more detailed information relating to sub-categories of the goods and

services, while still allowing the businesses to be categorized by a more general type of good or service such as a restaurant, furniture store, or car dealership.

Based on the foregoing, the Court finds that the patentee has indicated his intent to act as a lexicographer and provide his own definition of "category." *See Astrazeneca AB v. Mut. Pharm. Co.*, 384 F.3d 1333, 1339 (Fed. Cir. 2004) (finding that the patentee acted as his own lexicographer to limit the definition of solubilizer when he stated in the specification that "[t]he solubilizer suitable according to the invention are defined below"); *see also Edward Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1334 (Fed. Cir. 2009) (finding that the patentee's use of "i.e." in the specification signaled the patentee's intent to define the word to which it referred and thus limited the word's definition). The patentee's use of the term "defined" in the specification, its repeated use of parentheticals to describe category as "type of goods or services," and the examples of categories provided in the written description and the figures, all lend support to a finding that the patentee intended category to be defined as "type of good or service."

**2.    "categories in which respective businesses are classified"**

Travelocity applies its proposed construction of "category" to argue that "categories in which respective businesses are classified" should be construed to mean "types of goods or services of each business in the database." Def.'s Opening Claim Construction Br. 11, ECF No. 44. Travelocity largely bases its proposed construction on the plain and ordinary meaning of "respective," defined by Random House Webster's College Dictionary as "pertaining individually to each of a number of things." App. Supp. Def.'s Opening Claim Construction Br. (Random House Webster's Coll. Dictionary) at App. 30, ECF No. 45. Travelocity argues that, in the context of the claim, "respective businesses" necessarily refers to each business in the database. Def.'s Responsive Claim

8

194

A 523

Construction Br. 2, ECF No. 50. ICON argues, by contrast, that the term "classified" should be given its ordinary meaning "to arrange or group in classes according to some system or principle." Pl.'s Opening Claim Construction Br. 5, ECF No. 46; App. Pl.'s Opening Claim Construction Br. (Webster's New World Coll. Dictionary) at App. 130, ECF No. 47-3. ICON argues that the Court should apply the plain meaning of the terms "category" and "classified" to construe the disputed term as "classes in a scheme of classification in which respective businesses are arranged in said classes." Pl.'s Opening Claim Construction Br. 5-6, ECF No. 46.

In light of the Court's construction of "category," *see supra* Part III.1, the Court finds that Travelocity's proposed addition of the phrase "in the database" does not add an additional limitation to the claim, but rather adds clarification to the claim language, making clear that the businesses referred to are those existing in the database. *See* '853 Patent col. 10 ll. 25-26. Indeed, the preceding claim language–claiming "a database defined in the memory, the database including data about businesses, which data includes at least the names of respective businesses and categories in which respective businesses are classified"–clarifies that the businesses to which the claim refers are those included in the database. *See* '853 Patent col. 10 ll. 25-28. Based on the foregoing, the Court finds that the proper construction of "categories in which respective businesses are classified" is "type of good or service of each business in the database."

### 3.    "generating a screen display"

ICON argues that "generating a screen display" should be construed to mean "producing a screen display for communication to the client," where the "screen display" is a "web page or similar collection of data for constructing a visual display." Pl.'s Opening Claim Construction Br. 9, ECF No. 46. Travelocity argues that the claim language dictates that "generating a screen display" must

9

be construed as "selecting and arranging graphics items for inclusion in a screen visible on the client," where "graphics items" are construed as simply "images." Def.'s Opening Claim Construction Br. 12, ECF No. 44.

First, ICON contends that the Court should construe "generate" to mean "producing," in accordance with the Webster's New College World Dictionary definition. *Id.* at 12-13; App. Pl.'s Opening Claim Construction Br. (Webster's New World Coll. Dictionary) at App. 138, ECF No. 47-3. Travelocity responds that the term "generating" must necessarily include "selecting" graphics items pursuant to the language of the claim itself. *See* '853 Patent col. 10 ll.46-48. Claim 1 explains how, after generating a screen display, "the selection of individual graphics items for inclusion in the screen display vary[] depending on the results of the search." *Id.* col. 10 ll.46-48. Travelocity maintains that the only plausible antecedent basis for "the selection" is the act of "generating," referred to earlier in the claim. Def.'s Opening Claim Construction Br. 12, ECF No. 44. Travelocity further argues that "generating" must also include the "arranging" of graphics items based on claim language that provides that the screen display includes "graphics items arranged to provide the appearance of at least part of a commercial area." *See* '853 Patent col. 10 ll.36-39. Travelocity finds additional support for its proposed construction in the specification, which explains that in Step 64 the "server selects graphics in response to the results of the database search," *see id.* fig. 3, and that "at step 64, the server creates a virtual reality space by selecting and assembling graphics . . . in response to the results of the database search." *See id.* col. 8 ll.45-47. The Court finds that Travelocity has properly construed "generating" to mean "selecting and arranging graphics items."

Next, ICON argues that "screen display" must include a "web page or similar collection of data" based on the specification's discussion of (1) programming languages and software packages

10

that can be used to implement embodiments of the claimed invention, (2) web browsers that allow

a client to view text and graphics, and (3) the general purpose and workings of a web page. Pl.'s

Opening Claim Construction Br. 12, ECF No. 46 (citing '853 Patent col.2 ll.59-col.3 ll.14, col.5

ll.25-35, col.7 ll.10-15). Travelocity responds that while the specification discusses web pages and

web browsers when describing the background of the invention and the prior art, the specification

does not limit the screen display to a webpage. Def.'s Opening Claim Construction Br. 14, ECF No.

44 (citing '853 Patent col.8 ll.50-52). The Court finds Travelocity's argument persuasive. Neither

the claim language nor the specification limits the "screen display" to a web page. At best, the

specification explains that web browsers can be used to launch a virtual reality helper application

to view the text or graphics of the virtual reality space. *See* '853 Patent col.3 ll.18-20, col.8 ll.49-52.

ICON fails to point the Court to language in the specification that seeks to make web pages and web

browsers a limitation on the term "screen display," where the claim language does not include such

a limitation. Moreover, ICON fails to explain the meaning of a "similar collection of data" in its

proposed definition, or where that description is provided for in the claims.

Travelocity further argues that a "screen display" necessarily implies a "visible" screen, given

that Figures 5 through 10, described as "screens that are sent from the server to the client in response

to a database search query," *see* '853 Patent col.9 ll.60-61, all depict the screen as a scene visible to

the user's computer. Def.'s Opening Claim Construction Br. 13, ECF No. 44. Travelocity also

argues that the plain and ordinary meaning of "display" suggests that the item displayed be visible.

App. Supp. Def.'s Opening Claim Construction Br. (Random House Webster's Coll. Dictionary) at

App. 28, ECF No. 45; *id.* (The Merriam-Webster Dictionary) at App.33; *id.* (McGraw-Hill

Dictionary of Scientific & Technical Terms) at App. 38. ICON claims that the term "visible" ought

11

not to be included in the proposed construction because the proposed term would not comport with the subsequent limitation in the claim requiring the screen display to be "navigable to reveal graphics items adjacent those that are displayed." '853 Patent col. 10 ll. 44-46. ICON contends that "[i]f the screen display is a scene that is fully visible with no hidden parts then there would be no need for it to be navigable and no possibility of revealing other graphics items." Pl.'s Responsive Claim Construction Br. 9-10, ECF No. 51. The Court disagrees. The fact that the screen display must be navigable to reveal additional graphics items does not suggest that the graphics items initially present on the client are not visible.

Accordingly, the Court finds that the figures and the written description support a construction that defines "screen display" as something that is visible. *See Boss Indus., Inc. v. Yamaha Motor Corp. U.S.A., Inc.*, 333 F. App'x 531, 541 (Fed Cir. 2009) (finding that although the claim language does little to clarify the meaning of the disputed term, "the figures in the specification" supported the district court's construction of the term). Moreover, the inclusion of the requirement that the screen display be visible to the user's computer is consistent with the dictionary definition of "display." *See id.* (citing *Phillips* at 1322-23) (acknowledging that a construction "may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents"). The Court also construes "graphics items" as images, as explained below. *See infra* Part III.5. Based on the foregoing, the Court finds that the proper construction of "generating a screen display" is "selecting and arranging images for inclusion in a screen visible on the client."

12

4.    **"cause a screen display to be generated for the client"**

Both ICON and Travelocity ask the Court to apply its construction of "generating a screen display" as it appears in Claim 1 to the term "cause a screen display to be generated for the client" as it appears in Claims 10 and 11.  Pl.'s Opening Claim Construction Br. 13, ECF No. 46; Def.'s Opening Claim Construction Br. 11-12, ECF No. 44.  Given the similarity in language from Claim 1, the Court finds that the change in the structuring of the phrase in Claims 10 and 11 does not change the meaning of the term.  *See* '853 Patent col.11 ll.17-27, col.12 ll.11-25.  Accordingly, the Court construes the phrase to mean "cause the selection and arrangement of images for inclusion in a screen visible on the client."  *See supra* Part III.3.

5.    **"graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts"**

ICON argues that "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" should be construed to mean "graphics items arranged to provide the depiction of at least part of a commercial area and to include depictions of storefronts," where "graphics items" are defined as "pictures, images, renderings, drawings or other visual depictions," and "commercial area" is defined as "being a part of a building, lot, district, city, etc. having a commercial use or character."  Pl.'s Opening Claim Construction Br. 13-14, ECF No. 46.  Travelocity argues that the construction should read "graphics items arranged into a scene resembling a street having businesses, with some of the graphics items resembling the front exterior of a business facing the street," where "graphics items" are defined as "images."  Def.'s Opening Claim Construction Br. 15, ECF No. 44.

13

Both ICON and Travelocity cite the specification's description of a graphic as a "GIF" or "JPEG" in support of their proposed construction of "graphics items." *See* '853 Patent col.9 ll.49-50 ("In one embodiment, the server contains a regular graphic (e.g., a GIF or JPEG)."); *see also id.* col.3 l.19 ("Web browsers . . . allow a client to view text, graphics (e.g.; 'GIFS', 'JPEGs')."). Travelocity argues that ICON's proposed construction is incorrect, however, because nowhere in the specification or prosecution history does the patentee refer to "renderings, drawings, or other depictions," whereas the "GIF" and "JPEG," referenced in the specification, describe image formats. Def.'s Responsive Claim Construction Br. 6-7, ECF No. 50. ICON's own extrinsic evidence defines "GIF" as: "Graphics Interchange Format, a format for storing image files. It is the most common format for inline images in HTML documents. The other common format is JPEG." App. Pl.'s Opening Claim Construction Br. (A Glossary of Internet & Web Terminology) at App. 148, ECF No. 47-3. The same extrinsic evidence defines "JPEG" as: "Joint Photographic Experts Group, an image format. In general JPEG allows for higher quality images than GIF. Browsers cannot display JPEG images inline, and instead must display them using helper programs." *Id.* at App. 151. In light of the specification's repeated description of "graphics" as "images," and the consistent corroboration of ICON's extrinsic evidence, the Court finds that Travelocity's proposed construction of "graphics items" as "images" is correct.

Both ICON and Travelocity recognize that neither the claim nor the specification define "commercial area." Pl.'s Responsive Claim Construction Br. 10, ECF No. 51; Def.'s Opening Claim Construction Br. 15, ECF No. 44. ICON argues therefore that "commercial area" should be given its plain and ordinary meaning. Pl.'s Opening Claim Construction Br. 15, ECF No. 46. ICON contends that this definition can be found through an amalgamation of Webster's New World

14

College Dictionary's definition of "area"–defined as "a part of a house, lot district, city, etc. having a specific use or character"–with the definition of "commercial"–defined as "being part of a building, lot, district, city, etc. having a commercial use or character." App. Pl.'s Opening Claim Construction Br. (Webster's New World Coll. Dictionary) at App. 133, 137, ECF No. 47-3. Travelocity argues that ICON's proposed construction of "commercial area" improperly broadens the scope of the claims by (1) inadequately delineating the claim terms by using an open-ended list, (2) creating a proposed construction that fails to take into account the appearance of "multiple" storefronts, and (3) failing to construe the graphics for the storefronts as a subset of the graphics for the commercial area. Def.'s Opening Claim Construction Br. 19, ECF No. 44.

Travelocity begins its proposed construction of "commercial area" by examining the specification's description of the invention as a whole, which Travelocity describes as "a *scene*, composed from images, that is a navigable, physical metaphor of a *street having businesses*," as depicted by Figure 6. *Id.* at 15-17. Travelocity maintains that its proposed construction of "commercial area" as "a scene resembling a street having businesses" is proper because the specification read as a whole suggests that the character and fundamental nature of the invention requires such a limitation to be read onto the claim. *Id.* at 16. Travelocity further argues that every disclosed embodiment describes a virtual reality scene containing streets. *Id.* at 15-17; '853 Patent col.4 ll.24-31; *id.* col.8 ll.53-56 ("For example, in one embodiment, a navigable virtual reality scene is presented comprising a street having storefronts . . . representing the best hits from the database search. In one embodiment, a predetermined minimum amount of information about each business is provided on the street."); *id.* col.9 ll.14-22 ("It should be noted that the appearance of the street presented will vary depending on the results of the database search. The presented street will have

15

an appearance of interest to the user doing the search, and will have storefronts of businesses of

interest to that user . . . . Thus, like businesses are grouped together for the user's convenience on

a boulevard. In one embodiment, the appearance of the street (excluding the storefronts) changes

depending on the selected category . . . ."); *id.* col.9 ll.31-35 ("[Figures] 4A and 4B illustrate one

embodiment of making a virtual reality scene to be used in displaying database search results. As

illustrated in [Figure] 4A, a camera . . . is used to take several pictures of an actual street from

various vantage points."); *id.* col.9 ll.46-48 ("In an alternative embodiment, the virtual reality streets

are formed using animations.").

ICON responds that, although the claim language requires the screen display to include

storefronts, the claims do not require that those storefronts face a street. Pl.'s Responsive Claim

Construction Br. 11, ECF No. 51. ICON maintains that only certain embodiments describe the

virtual reality scene as having a street, and that the claim language never makes reference to a street.

*Id.* at 12. ICON argues that the determination of whether a "commercial area" requires a street is

better suited for the infringement analysis. *Id.* at 11-12. The Court agrees with ICON. While the

specification references streets in its description of certain embodiments, the specification does not

include streets as a part of every embodiment, nor does the claim language make mention of a street.

*See, e.g.,* '853 Patent col. 8 ll.63-col. 9 ll.6, col.9 ll.48-52. Moreover, the specification is not so clear

and unambiguous as to support a finding that the fundamental nature of the invention requires a

virtual scene depicting a street. *See Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1325 (Fed. Cir.

2008) ("The claims of the patent must be read in light of the specification's consistent emphasis on

this fundamental feature of the invention.").

Travelocity next argues that "storefronts" should be construed as "resembling the front exterior of a business facing the street," in accordance with the dictionary definitions. Def.'s Opening Claim Construction Br. 18, ECF No. 44; App. Supp. Def.'s Opening Claim Construction Br. (The American Heritage Dictionary) at App. 45, ECF No. 45; id. (Random House Webster's College Dictionary) at App. 29.[1] The specification describes certain embodiments as a virtual reality scene encompassing a street with storefronts. See '853 Patent col.8 ll.53-55 ("[I]n one embodiment, a navigable virtual reality scene is presented comprising a street having storefronts."); id. col.9 ll.14-18 ("[T]he appearance of the street presented will vary depending on the results of the database search. The presented street will have an appearance of interest to the user doing the search, and will have storefronts of businesses of interest to that user."); id. col.9 ll.48-52 ("In one embodiment, the server contains a regular graphic (e.g., a GIF or JPEG) of a storefront for each business, and the server creates a virtual reality scene by stitching together graphics in response to the results of a database search."). The specification does not, however, make the inclusion of a street a requirement of the virtual reality scene. See Thorner v. Sony Computer Entm't Am. LLC, No. 2011-1114, 2012 WL 280657, at *2 (Fed. Cir. Feb. 1, 2012) ("It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments . . . ."). Travelocity even concedes that alternative definitions of "storefront" exist, such as "[a] room in a commercial building at street level," which would not necessarily require a street in the scene. Def.'s Opening Claim Construction Br. 18, ECF No. 44; App. Supp. Def.'s Opening Claim Construction Br. (The American Heritage Dictionary) at App. 45, ECF No. 45. ICON contends that "storefront" should

---

[1] Travelocity also uses the definition of storefront as further support for its argument that the "commercial area" must include a street. Def.'s Opening Claim Construction Br. 18, ECF No. 44.

17

be given its plain and ordinary meaning, but does not offer a specific alternative construction. Pl.'s Opening Claim Construction Br. 16-17, ECF No. 46. While the Court finds that the plain and ordinary meaning of "storefront" includes the "front exterior of a business," the Court finds, as explained above, that neither the claim language nor the specification necessarily contemplates the existence of a street.

Finally, Travelocity argues that ICON's proposed construction improperly divides out "storefronts" as a graphics item separate from the "commercial area." Def.'s Responsive Claim Construction Br. 8, ECF No. 50. Travelocity argues that the claim language–"graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts"–makes clear that the storefronts are a subset of the commercial area. '853 Patent col.10 ll.37-40. The Court finds Travelocity's proposed construction to be consistent with the claim language.

Based on the foregoing, the Court construes the term "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts," as "images arranged into a scene resembling an area having businesses, at least some of the images having the look of the front exterior of a business."

6.    "multiple storefronts of the screen display"

ICON argues that "multiple storefronts of the screen display" should be construed to mean "the screen display includes depictions of more than one storefront." Pl.'s Opening Claim Construction Br. 16, ECF No. 46. Travelocity contends that the term should be construed as the "the front exterior of multiple businesses facing the street that are visible in the scene." Def.'s Opening Claim Construction Br. 19-20, ECF No. 44. In support of its proposed construction, ICON points

18

to the prosecution history, which states that "multiple storefronts are associated with businesses of the same category depending on the search request. For example, if the search request specified restaurants (see Fig. 6), multiple storefronts of the screen display (Fig. 7) would be associated with restaurants." App. Pl.'s Opening Claim Construction Br. (Resp. Office Action of May 18, 1998) 8, at App. 99, ECF No. 47-2. The parties repeat their arguments as to the construction of the terms "storefront" and "screen display," and do not argue that the terms should be construed differently in this context. *See* Pl.'s Responsive Claim Construction Br. 14, ECF No. 51; Def.'s Responsive Claim Construction Br. 10, ECF No. 50.

The Court has already determined the proper construction of "storefront" to be the "front exterior of a business," *see supra* Part III.5, and the proper construction of "screen display" to be "images in a screen visible on the client," *see supra* Part III.3. Further, the Court finds that "multiple" can be given its plain and ordinary meaning of "more than one," and neither party argues otherwise. Based on the foregoing, the Court finds that the proper construction of "multiple storefronts of the screen display" is "more than one front exterior of a business in a screen visible on the client."

7.    **"appearance of respective storefronts"**

ICON declines to provide a specific construction of the phrase "appearance of respective storefronts," other than to contend that it should be given its plain meaning. Pl.'s Opening Claim Construction Br. 17, ECF No. 46. Travelocity contends that the term should be construed as "the look of the front exterior of each business facing the street." Def.'s Opening Claim Construction Br. 17, ECF No. 44. ICON looks to the claim language and the specification as a whole to find that the patent "discusses the use of visual depictions, such as photographs and images, to be included in the

19

generated display for a client with some of those visual depictions being depictions of storefronts." *Id.* ICON repeats its argument that Travelocity's proposed construction attempts to import limitations from the specification onto the claim, namely, "facing the street," which ICON argues appears in only one embodiment. *Id.*

Travelocity argues that its proposed construction is consistent with the patentee's stated goals of (1) "making a visually stimulating Yellow Pages" and (2) "physically grouping like businesses together." '853 Patent col.9 ll.14-29. Travelocity also cites the following language from the specification: "the appearance of the street presented will vary depending on the results of the database search. The presented street will have an appearance of interest to the user doing the search, and will have storefronts of businesses of interest to that user." *Id.* col.9 ll.14-17. Travelocity again offers the dictionary definition of "storefront" as "the side of a store facing a street." Def.'s Opening Claim Construction Br. 21, ECF No. 44. Further, Travelocity reiterates that "respective" should be defined as "pertaining individually to each of a number of things." Def.'s Responsive Claim Construction Br. 10, ECF No. 50.

The term at issue appears only in Claim 6, a dependent claim of Claim 1. '853 Patent col.10 l 66. The dependent nature of Claim 6 suggests that the "respective storefronts" to which the claim language refers are those that appear in the screen display referenced in Claim 1. As such, the terms should be given meaning consistent with their construction in Claim 1. The Court finds that the term "appearance" should be given its plain and ordinary meaning of "look," and the parties do not argue otherwise.[2] As explained above, the Court has construed "storefront" to mean the "front exterior of

---

[2] At the hearing, the parties agreed that "appearance" should be construed to mean the "look" of the respective storefronts.

20

a store," *see supra* Part III.5, 6; "respective" to mean "pertaining individually to each of a number of things," *see supra* Part III.2; and "screen display" to mean "a screen visible on the client," *see supra* Part III.3. Based on the foregoing, the term "appearance of respective storefronts" should be construed to mean "the look of the front exterior of each business in a screen visible on the client."

### 8.    "respective graphics items being associated with respective businesses"

ICON argues that "respective graphics items being associated with respective businesses" should be construed to mean "particular graphics items are associated with a particular business for which information was returned as a result of the search." Pl.'s Opening Claim Construction Br. 19, ECF No. 46. Travelocity argues that the correct construction is "each graphics item in the scene is associated with a particular business in the database." Def.'s Opening Claim Construction Br. 21, ECF No. 44. Both ICON and Travelocity point the Court to the specification language stating that "[i]n one embodiment, the server contains a regular graphic (e.g., a GIF or JPEG) of a storefront for each business." '853 Patent col.9 ll.48-49. ICON also cites to the prosecution history, wherein the patentee states that "[i]n the embodiment of applicant's invention . . . multiple storefronts are associated with businesses of the same category depending on the search request. For example, if the search request specified restaurants (see Fig. 6), multiple storefronts of the screen display (Fig. 7) would be associated with restaurants." App. Pl.'s Opening Claim Construction Br. (Resp. Office Action of May 18, 1998) 7, at App. 98, ECF No. 47-2. ICON also cites to selections of the specification that discuss graphics items not associated with a particular business. *See* '853 Patent col.8 ll.65-67 ("[I]f the search were a search for restaurants, a billboard may show an advertisement for a cola product."); *see also id.* col. 9 ll. 4-6 ("Other features of streets, such as street lamps, phone booths, etc., may be presented for added visual effect."). Accordingly, ICON maintains that

21

A 536

Travelocity's proposed construction is incorrect because it is possible that some "graphics items" are not associated with a particular business. Pl.'s Responsive Claim Construction Br. 16, ECF No. 51.

Travelocity reiterates the definition of "respective" as "pertaining individually to each of a number of things," arguing that the term "respective" is not a term of art such that dictionaries can be used to define it in the context of the claim. Def.'s Opening Claim Construction Br. 21-22, ECF No. 44. Travelocity then points to Figure 4B as evidence that each graphics item in the generated scene represents a particular business. *Id.* at 22. Travelocity argues that ICON's proposed construction of "particular" graphics items potentially includes a selection that encompasses less than all of the graphics items, and therefore changes the claim scope. *Id.* at 23.

The Court finds that Travelocity's proposed construction unduly narrows the claims.[3] The patentee's use of the word "respective" in this context refers to "graphics items having the appearance of storefronts" referenced in the preceding clause. *See* '853 Patent col.10 ll.39-40. The claim language instructs that "at least some" of the graphics items must have the appearance of storefronts, which suggests that some of the graphics items may not. *See id.* col.10 l.38. Accordingly, the graphics item that are "associated with respective businesses" are those graphics items that have the appearance of storefronts, but may exclude graphics items not related to storefronts. This construction is supported by the specification, which speaks of the possibility of

---

[3] The Court notes that, at the hearing, both parties argued that the term "respective" should be given the same meaning throughout all of the claims. Yet, both parties also conceded that the proper definition of "respective" depends on the context in which it appears. Here, the Court finds that the structure of the claim language does not indicate that "respective" should be construed to mean that each of the graphics items are associated with a business, as the term is used in the other parts of the claim. Rather, the claim language suggests that only particular graphics items are associated with particular businesses.

22

graphics items other than storefronts. *See* '853 Patent col.8 ll.65-67, col. 9 ll. 4-6. In addition, the Court finds that the "businesses" to which the claim language refers are those that resulted from the search, as made clear by the preceding language, which states that "the screen display var[ies] depending on the results of the search." *See, e.g.,* '853 Patent col.10 ll.36-37. Based on the foregoing, the Court finds that the proper construction of the "respective graphics items being associated with respective businesses" is "particular graphics items being associated with a particular business for which information was returned as a result of the search."

### 9. "screen display being navigable to reveal graphics items adjacent those that are displayed"

ICON argues that "screen display being navigable to reveal graphics items adjacent those that are displayed" should be construed to mean "the screen display includes information enabling interactive direction at the client to reveal graphics items adjacent those being displayed." Pl.'s Opening Claim Construction Br. 20, ECF No. 46. Travelocity argues that the term should be construed to mean "the screen viewed on the client permits movement through the scene to display additional graphics items stitched together side by side to graphics items previously visible in the scene." Def.'s Opening Claim Construction Br. 24, ECF No. 44.

First, the parties dispute the term "navigable." *See* Pl.'s Opening Claim Construction Br. 20, ECF No. 46; Def.'s Opening Claim Construction Br. 24, ECF No. 44. In describing "virtual reality," the specification explains that the term is "not necessarily meant to describe the type of virtual reality that involves the use of gloves and helmets or goggles, but instead is used to describe the type of virtual reality that permits navigation through a scene, or manipulation of objects, using a mouse and keyboard." '853 Patent col.5 ll.25-31. The specification later explains that "[a] virtual reality scene

23

is a space in which a user can navigate by looking up, looking down, turning around, zooming in, or zooming out." *Id.* col.5 ll.44-46. ICON reads the Webster's New World College Dictionary definition of "navigable"–that which "can be steered, or directed"–in light of the specification to arrive at its proposed construction of "enabling interactive direction." Pl.'s Opening Claim Construction Br. 20-21, ECF No. 46; App. Pl.'s Opening Claim Construction Br. (Webster's New World Coll. Dictionary) at App. 130, ECF No. 47-3.

Travelocity argues that "navigation" or "navigate" in the year 1995 referred to "movement of location *through* a space, whether real or virtual." Def.'s Opening Claim Construction Br. 24, ECF No. 44; Def.'s Opening Claim Construction Br. (The Dictionary of Computer Graphics and Virtual Reality) at App. 49, ECF No. 45; *id.* (The American Heritage Dictionary) at App. 47; *id.* (The Merriam-Webster Dictionary) at App. 35. Travelocity contends that in all of the described embodiments, "the client must be able to move *through* the generated street scene in order to access a virtual business." Def.'s Opening Claim Construction Br. 24, ECF No. 44. In support of its proposed construction, Travelocity points to Figure 7, which the specification describes as a figure that "illustrates a scene after a user has navigated part way down the street." '853 Patent col.9 ll.66-67. The specification uses the term "navigate" several times, explaining that "a user of a client navigates into one of the storefronts," *id.* col.9 ll.7-8, "[d]ifferent types of music can play while a user navigates through a scene," *id.* col.9 ll.26-28, "audible advertising can play while the user navigates through the scene," *id.* col.9 ll.28-29, "[a]s the user navigates in the scene, the virtual reality player keeps up with the user's movements," *id.* col.9 ll.42-44, and "scenes involve navigating through a single panoramic image," *id.* col.9 ll.55-56. Travelocity argues that "navigate" suggests movement through space, rather than merely an ability to steer or control, as proposed by ICON.

24

Def.'s Opening Claim Construction Br. 25-26, ECF No. 44. The Court agrees with Travelocity.[4]

The Court finds that the specification's consistent use of the term "navigate" in its description of the

embodiments teaches that the term "navigate" is used to describe movement through the scene,

rather than the mere ability to control.

The parties next dispute the construction of the term "adjacent." *See* Pl.'s Responsive Claim

Construction Br. 21, ECF No. 51; Def.'s Opening Claim Construction Br. 26, ECF No. 44. ICON

argues that "adjacent" should be construed to mean "near or close (to something); adjoining," as

defined by Webster's New World College Dictionary, which also explains that "adjacent things may

or may not be in actual contact with each other." Pl.'s Opening Claim Construction Br. 21, ECF No.

46; App. Pl.'s Opening Claim Construction Br. (Webster's New World Coll. Dictionary) at App.

132, ECF No. 47-3. Travelocity argues that "adjacent" should be construed as "stitched together side

by side." Def.'s Opening Claim Construction Br. 26, ECF No. 44. The relevant portion of the

specification states:

> FIGS. 4A and 4B illustrate one embodiment of making a virtual
> reality scene to be used in displaying database search results. As
> illustrated in FIG. 4A, a camera is used to take several pictures of an
> actual street from various vantage points. These photographs are
> digitized, and electronically stitched together, as illustrated in FIG
> 4B. To allow stitching of photographs where the camera turns
> corners, the images are warped such that straight lines become curved
> lines, so that all adjacent photographs can be stitched together side by
> side to form a panorama. The virtual reality player in the client
> computer only views one small portion of the stitched photograph

---

[4] At the hearing, ICON observed that Travelocity's proposed construction of "navigable" had the
potential to render the "virtual reality scene" claimed in dependent Claim 9 a nullity. ICON, however, did
not go so far as to contend that Travelocity's proposed construction did so. The Court likewise finds that
Travelocity's proposed construction of the term "navigable" does not invalidate Claim 9, but rather gives full
force to Claim 1, which claims a screen display that is able to be navigated, rather than one that merely
remains static.

> panorama at a time, and unwarps that portion so that straight lines
> appear straight. As the user navigates in the scene, the virtual reality
> player keeps up with the user's movements, unwarping and displaying
> the user's vantage point of the panorama on the fly. In an alternative
> embodiment, the virtual reality streets are formed using animations.

'853 Patent col.9 ll.30-47.

ICON argues that Travelocity's proposed construction is incorrect because the claim language does not require that all graphic items be stitched together. Pl.'s Responsive Claim Construction Br. 18, ECF No. 51. Rather, ICON contends that the stitching-together process is described in only one embodiment, and that the alternative embodiment discloses that the virtual reality scene can be formed using "animations" rather than stitching. *See* '853 Patent col.9 ll.45-46. ICON is correct in noting that only one embodiment speaks of electronically stitching together photographs to create a virtual reality scene. *See* '853 Patent col.9 ll.30-44. Moreover, the only time that the term "adjacent" appears in the specification, the written description states that "all adjacent photographs *can* be stitched together side by side to form a panorama." *See id.* col.9 ll.38-39 (emphasis added). The description therefore indicates that the "adjacent" photographs need not be "stitched together," since a contrary reading would make the specification language redundant. Thus, it appears that graphics items can be adjacent, without necessarily being stitched together. Accordingly, the Court finds that the term "adjacent" should be given its plain and ordinary meaning of "near or close (to something); adjoining."

Based on the foregoing, the Court finds that the proper construction of "screen display being navigable to reveal graphics items adjacent those that are displayed" should be construed as "screen visible on the client that is able to permit movement through the scene to display additional graphics items near or adjoining other graphics items previously visible in the scene."

## IV.    CONCLUSION

In summary, the Court construes the disputed claim terms as follows:

1.  "category" means "type of good or service."

2.  "categories in which respective businesses are classified" means "type of good or service of each business in the database."

3.  "generating a screen display" means "selecting and arranging images for inclusion in a screen visible on the client."

4.  "cause a screen display to be generated for the client" means "cause the selection and arrangement of images for inclusion in a screen visible on the client."

5.  "graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts" means "images arranged into a scene resembling an area having businesses, at least some of the images having the look of the front exterior of a business."

6.  "multiple storefronts of the screen display" means "more than one front exterior of a business in a screen visible on the client."

7.  "appearance of respective storefronts" means "the look of the front exterior of each business in a screen visible on the client."

8.  "respective graphics items being associated with respective businesses" means "particular graphics items being associated with a particular business for which information was returned as a result of the search."

27

9. "screen display being navigable to reveal graphics items adjacent those that are displayed" means "screen visible on the client that is able to permit movement through the scene to display additional graphics items near or adjoining other graphics items previously visible in the scene."

**SO ORDERED** on this **1st day** of **May, 2012.**

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

28

214



US006002853A

# United States Patent [19]

## de Hond

[11] **Patent Number:** **6,002,853**

[45] **Date of Patent:** *****Dec. 14, 1999**

[54] **SYSTEM FOR GENERATING GRAPHICS IN RESPONSE TO A DATABASE SEARCH**

[75] Inventor: **Maurice de Hond**, Amsterdam, Netherlands

[73] Assignee: **Wegener Internet Projects BV**, Apeldoorn, Netherlands

[ * ] Notice: This patent is subject to a terminal disclaimer.

[21] Appl. No.: **08/951,064**

[22] Filed: **Oct. 15, 1997**

**Related U.S. Application Data**

[63] Continuation of application No. 08/548,873, Oct. 26, 1995, Pat. No. 5,737,533.

[51] **Int. Cl.**[6] ............................. **G06F 13/38; G06F 17/30**
[52] **U.S. Cl.** ................................... **395/200.49;** 345/357
[58] **Field of Search** ....................... 395/200.09, 200.47, 395/200.48, 200.49; 345/333, 334, 335, 336, 337

[56] **References Cited**

U.S. PATENT DOCUMENTS

5,689,669  11/1997  Lynch et al. ............................ 395/355

5,737,533  4/1998  de Hond ............................ 395/200.49

OTHER PUBLICATIONS

"HyperImages: Using Object Recognition For Navigation Through Images in Multimedia", D. Lowe and A. Ginige, pp. 418–429, Feb. 9, 1995.
"Scientific Graphics and Visualization Come to the Internet", Scientific Computing World, D. Moralee, pp. 31, 33, 34 & 36, Mar., 1995.
"Using Structured Documents for Implementing Product/Service Yellow Pages Architecture on the Internet", Dennis S. Arnon et al., pp. 312–321, Dec. 1994.
Arnon et al, Using Structured Documents for Implementing Product/Service Yellow Pages Architecture on the Internet, pp. 312–321, Dec. 1994.

*Primary Examiner*—Richard L. Ellis
*Attorney, Agent, or Firm*—Deepak Malhotra

[57] **ABSTRACT**

A system comprising a server having a memory, and a database defined in the memory; and a client in communication with the server, the server communicating to the client an interface for use in requesting a search of the database, and the server having virtual reality means for generating a virtual reality scene, the virtual reality scene varying depending on the results of the search.

**11 Claims, 7 Drawing Sheets**











$\mathbb{FIG}$ _4A_



$\mathbb{FIG}$ _4B_



_FIG. 5_



_FIG. 6_



FIG 7



FIG 8



_FIG 9_



_FIG 10_

6,002,853

**1**

# SYSTEM FOR GENERATING GRAPHICS IN RESPONSE TO A DATABASE SEARCH

## CROSS REFERENCE TO RELATED APPLICATIONS

This is a Continuation of U.S. patent application Ser. No. 08/548,873, now U.S. Pat. No. 5,737,533, filed Oct. 26, 1995, and titled "Yellow Pages in Cyberspace".

## TECHNICAL FIELD

The invention relates to systems including databases. More particularly, the invention relates to systems including displays for displaying the results of a database search. The invention also relates to computer networks.

## BACKGROUND OF THE INVENTION

Yellow Pages are known by everyone as a directory of businesses, as well as a medium for advertising. The concept of Yellow Pages was developed more than 80 years ago. This type of directory contains information about businesses categorized by headings. The categories are defined by type of product or service sold by the various businesses. Some basic information (e.g.; business name, address, phone number) is provided for each included business. Additional information can be included if a business is willing to pay extra. For example, a business can pay extra to have an in-column or display add included.

Businesses find the Yellow Pages to be a useful advertising resource. Users find the Yellow Pages to be a handy resource for finding solutions to problems.

Yellow Pages are used in all developed countries, and many other countries. Household members turn to Yellow Pages quite frequently (e.g., 100 times per year in the United States, 10–75 times per year in other countries). The Yellow Pages industry is very profitable. It is not uncommon for earnings after tax to exceed 25% of revenues. Worldwide revenues are higher than $15 billion.

Different Yellow Pages directories are published for different geographical regions (e.g.; cities, metropolitan areas, counties, collections of towns, etc.). For different geographical region, there may be several publishers of competing Yellow Pages. In addition, there are various specialty Yellow Pages, such as ethnic Yellow Pages (e.g., the Black Pages, etc.) of businesses owned by certain ethnic groups, toll free or "800" directories, etc.

Publishers sell advertisements in Yellow Pages using various techniques. Local or regional telephone companies often play a major part in sales of advertising space. These local or regional telephone companies hire a sales agent, such as L. M. Berry (TM) of Dayton, or Donnely (TM) to sell the advertising space.

Yellow Pages directories found in different countries are similar in organization and appearance to those discussed above.

With the advent of the electronic age, there is a push to make the information normally contained in Yellow Pages available in electronic media. For example, it is known to provide CD ROMs containing at least the data of Yellow Pages, if not the advertising. Such CD ROMs may be published by the same publishers who publish the paper versions of the Yellow Pages. The publishers may take the same data from the paper version, and publish it in on a CD ROM. Such electronic Yellow Pages may also be contained in commercial databases, such as DIALOG (SM) databases. DIALOG is a service mark of Dialog Information Services, Inc., which is a subsidiary of Lockheed Corporation.

**2**

The advantage of having the information in an electronic form is that it becomes much easier to search the information. For example, if you have a message to call a phone number, but cannot make out the callers name, it is possible with an electronic version of the Yellow Pages to search for the phone number, and find the business name and address. Such a search is not easily performed with a paper version, because the data is typically organized alphabetically by business name, not numerically by phone number. Other types of searches are also possible, with the electronic version, by using conventional database searching techniques and boolean connectors.

Some electronic databases including Yellow Pages information are now appearing on the Internet.

The Internet is a worldwide network of computers. The Internet began under the name ARPANET, and was started by the Advanced Research Projects Agency of the U.S. Department of Defense. For the military, computers are useful for command and control, and the original reason for ARPANET was to provide redundant connections between computers so as to have communications that are not subject to failure. Protocols were developed that allowed communications between computers over any available route, instead of a fixed route. A problem with an earlier protocol was that it restricted the number computers that could be on the ARPANET. A new protocol, called Transmission Control ProtocolInternet Protocol (TCP/IP), was later developed, and is now one of the most widely accepted networking protocols. Universities and research facilities communicated over ARPANET. In the late 1980s, the National Science Foundation developed a network (NSFNET) to connect its supercomputer centers, and this network used the TCP/IP protocols. Eventually, publicly and privately funded networks including ARPANET, and various other networks (UUCP, MILNET, USENET, BITNET, CSNET, NASA Science Internet) joined the NSFNET networks, and the collection of networks is called the Internet. The Internet today includes an international connection of intercommunicating networks, both privately and publicly funded. Most computer systems support TCP/IP, and connecting to the Internet is easy and inexpensive.

The World Wide Web is the multimedia aspect of the Internet. The World Wide Web originated at CERN (Centre Europeen pour la Récherche Nucleaire in Geneva, Switzerland). Hyperlinks in documents provide for immediate connection to other documents which may be on the same or on a different computer. By clicking or selecting hyperlinked terms or graphics on a web page, you are taken to another web page, or to another location in the web page you are currently reading. This is useful, for example, if reading a paper that has footnotes—while reading the main text of document, you can select a hyperlink and be taken directly to the appropriate footnote, and then, with a click of a button, back to the main text. Hyperlinks are also useful for reading a document containing complex terminology for which definitions are hyperlinked. Further, some people collect a list of resources relevant to a topic of interest, and provide hyperlinks to each of the resources from a web page. Web pages are typically written using HTML (hyper text markup language). HTML documents or pages typically include text, and references to graphics files on the servers, as well as hyperlinks. When viewed on a client computer, the graphics are combined with the text on a single screen, and some words are underlined or differently colored (or a box may appear around graphics). If these special words or graphics are clicked on with a mouse, a hyperlink prescribed in the HTML document will be followed. This will result in

6,002,853

| 3 | 4 |

the client being connected to another document or file (e.g.; graphics file, sound file, etc.) which may or may not reside on a different server, or to another section of the same document. HTML is well known, and many references are available on-line that describe HTML. HTML is also described in *HTML Sourcebook*, by Ian S. Graham, published by John Wiley & Sons, Inc. HTML documents that are loaded on servers can be viewed by remote computers (clients) that have web browsers loaded thereon. One well known web browser is Mosaic (TM), available from NCSA (the National Center for Supercomputing Applications at the University of Illinois at Champaign-Urbana). Another popular web browser is Netscape (TM), available from Netscape Communications Corporation, 501 East Middlefield Road, Mountain View, Calif., 94043.

Hyperlinking is also known in other applications, such as in FolioViews (TM) documents.

Web browsers such as Mosaic and Netscape allow a client to view text, graphics (e.g.; "GIFs", "JPEGs"), or a combination of text and graphics presented to the client from a server accessed by the client. The servers have unique URLs (uniform resource locators), using which the client can connect to a desired server. The typical format of a URL is HTTP://WWW.SERVER.COM/DOCUMENT.HTML, where "SERVER" would be replaced by the name of a server; "COM" would be replaced by a country code if the server is outside the U.S., or by "MIL" if a military server, or "ORG" if an organization, or "EDU" if an educational server, etc.; and where "DOCUMENT.HTML" would be replaced by the name of a document or file on the server which the client is accessing, or omitted to pull up a "home page" (a starting point for the web site). Web browsers can also be configured to launch "helper applications" when the client is presented with a file type that the browser cannot handle. File types are indicated by the extension after a dot (".") in the filename; e.g.: JPG; .GIF, .HTML, .WAV, .MPG, etc. If the client has loaded thereon viewer or player software that can handle such a file type, the browser software on the client can be configured to start (launch) the viewer software (the helper application) acting on such files if they are received. For example, if the client receives a .WAV file (an audio file), the client may automatically launch an audio player on the client computer so that the user at the client hears the sound without having to manually start the audio player on the client computer. Similarly, if the client receives a MPG file (a soundless movie file in "MPEG" format), the client may automatically launch a mpeg player to start a movie.

Some forms of Yellow Pages directories are now available on the World Wide Web. For example NYNEX maintains a web site.

Other networking protocols and hardware are also known and used for setting up networks such as local area networks (LANs) and wide area networks (WANs).

Various businesses are finding it useful to be physically located close to other businesses that sell the same or similar goods and services. Businesses that are located next to other businesses that sell similar goods and services see an increase in traffic (visits by potential customers) because the customer who is interested in a particular good or service can more easily comparison shop or locate hard to find goods or services. For example, car dealers are frequently located near other car dealers, some restaurants are located near other restaurants, some furniture stores are located near other furniture stores, etc.

It would be desirable to provide Yellow Pages information in a visually stimulating manner so as to encourage adver-

tising by businesses, and use of the Yellow Pages by consumers. It would also be desirable to present electronic information from a database in a form where similar goods and services are grouped together.

### BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the invention are described below with reference to the accompanying drawings, which are briefly described below.

FIG. 1 is a block diagram illustrating a system embodying the invention.

FIG. 2 is a block diagram illustrating in greater detail some of the components included in the system of FIG. 1.

FIG. 3 is a flowchart illustrating operation of the system of FIG. 1.

FIGS. 4A, 4B illustrate how a virtual reality scene is made.

FIGS. 5–10 illustrate sample virtual reality scenes produced by the system of FIG. 1.

### SUMMARY OF THE INVENTION

The invention provides a system comprising a server having a memory, and a database defined in the memory; and a client in communication with the server, the server communicating to the client an interface for use in requesting a search of the database, and the server having virtual reality means for generating a virtual reality scene, the virtual reality scene varying depending on the results of the search.

Another aspect of the invention provides a server comprising a memory, and a database defined in the memory, the database including data about a first classification of businesses, which data respectively includes business name, address, phone number, and goods or services provided by the business, the database further including data about a second classification of businesses, which data respectively includes more data than is provided for each first classification business; communication hardware providing for communication between the server and clients via TCP/IP; the server communicating to the client an interface for use in requesting a search of the database in response to a client connecting to the server, and the server generating a virtual reality scene in response to the client requesting a search of the database, the virtual reality scene varying depending on the results of the search.

### Detailed Description of the Preferred Embodiments

FIG. 1 illustrates a system 10 embodying the invention. The system 10 comprises a server 12, which can be a minicomputer, a microcomputer, a UNIX (TM) machine, a mainframe computer, a personal computer (PC) such as an Intel (TM) 286, 386, 486, or Pentium (TM) personal computer or clone thereof or Apple (TM), Macintosh (TM), or PowerPC (TM) personal computer or clone thereof, or any other appropriate computer. The server 12 includes typical components (see FIG. 2) such as a processor 20, input devices 22 (e.g.; keyboard and mouse), output devices 24 (e.g.; monitor and printer), ROM 26, RAM 28, memory 30 (e.g. hard drive, disk drive, tape unit, CD-ROM, etc.), serial ports (not shown), parallel ports (not shown). communication hardware 32, which may either be internal or external, such as internal communication cards (e.g., modem card or network card) or external communication hardware (e.g., external modem), etc. The server 12 has a multi-user, multi-tasking operating system such as UNIX (if the server

6,002,853

**5**

is a UNIX machine), LINUX (if the server is a personal computer), etc.

The system 10 further comprises (see FIG. 1) a plurality of clients 16*a–h*. The clients 16*a–h* comprise computers such as minicomputers, microcomputers, UNIX (TM) machines, mainframe computers, personal computers such as an Intel (TM) 286, 386, 486, or Pentium (TM) personal computers or clones thereof or Apple (TM), Macintosh (TM), or PowerPC (TM) personal computers or clones thereof, or any other appropriate computer, in any combination. In other words, the client 16*a* may be a different computer than the client 16*b*, which in turn may be different from the client 16*c*, etc. The clients 16*a–h* include typical components (see FIG. 2) such as a processor 34, input devices 36 (e.g.; keyboard and mouse), output devices 38 (e.g., monitor and printer), RAM 40, ROM 42, memory 44 (hard drive, disk drive, tape unit, CD-ROM, etc.), serial ports (not shown), parallel ports (not shown), communication hardware 46, which may either be internal or external, such as internal communication cards (e.g., modem card or network card) or external communication hardware (e.g., external modem), etc. The clients 16*a–h* respective have loaded in memory 44 web browsers 48 such as Mosaic or Netscape (see FIG. 2). The clients 16*a–h* also respective have loaded in memory 44 virtual reality viewers 50. The term "virtual reality", as used herein, is not necessarily meant to describe the type of virtual reality that involves the use of gloves and helmets or goggles, but instead is used to describe the type of virtual reality that permits navigation through a scene, or manipulation of objects, using a mouse and keyboard, such as by using QuickTime VR, developed by Apple Computer, Inc., or the Virtual Reality Modeling Language (VRML). VRML was apparently developed by Gavin Bell of Silicon Graphics, Inc.; Anthony Parisi, Intervista Software; and Mark Pesce, VRML list moderator.

VRML is a language which can be used for developing multi-participant interactive simulations, and virtual worlds hyperlinked via the World Wide Web. In the illustrated embodiment, the multi-participant aspect of VRML is not necessarily used, except that, of course, multiple client can access and use the server 12 simultaneously. The first version (Version 1.0) of VRML provides for creation of virtual worlds or scenes, and virtual objects.

A virtual reality scene is a space in which a user can navigate by looking up, looking down, turning around, zooming in, or zooming out. A virtual reality object is an interactive object. By clicking or dragging virtual reality objects, you can view different sides of the object to examine the object, like merchandise in a store. HTML pages can be hyperlinked to virtual reality objects.

HTML 3.0 (a version of HTML) lets a HTML developer decide which portions of a screen are refreshed and which portions remain unchanged. Dynamically produced HTML pages are known in the art. The QuickTime VR viewer can be obtained online by connecting to Apple's server (HTTP:// QTVR.QUICKTIME.APPLE.COM).

The web browsers are each configured to launch the virtual reality viewer 50 as a "helper application" when the client is presented with a virtual reality file type. For example, with a Netscape browser, this is done by clicking or pulling down the "Options" menu, clicking on "Preferences" so the preferences window opens, clicking on "Helper Applications" so the helper applications preferences window opens, and then selecting the virtual reality player (e.g.; C:\QTVR\PLAYER.EXE) to launch when a virtual reality type file is encountered (e.g., a file with extensions

**6**

.WRL, .QT, or .MOV). New file types can be added by clicking the "New Type" button. File types are indicated by the extension after a dot (".") in the filename; e.g.: JPG; .GIF, .HTML, .WAV, .MPG, etc. VRML files have the extension .WRL, and QuickTime VR files have the extension .QT or .MOV (as do regular movies). More advanced virtual reality languages (or language versions) for use with the World Wide Web are also being developed, and are employed in alternative embodiments of the invention.

The clients 16*a–h* are respectively connected to the server 12 via communication links 14*a–h*. Some or all of the communication links 14*a–h* may be either temporary links or permanent links. The communication links 14*a–h* comprise satellite links, RF links, LAN links, WAN links, telephone line links, or any link for permitting communication between computers, in any combination. In other words, the link 14*a* may be a different type of link than the link 14*b*, which in turn may be a different type of link than the link 14*c*, etc.

Although only a limited number of clients are shown connected to the server 12, in the illustrated embodiment, a large number of clients can be simultaneously connected to the server 12.

Different protocols may be employed for communication between the clients 16*a–h* and the server 12. In the preferred embodiment, the TCP/IP protocol is employed for communication between the server 12 and the clients 16*a–h*. More particularly, in the illustrated embodiment, the server 12 is a node on the Internet, and one or more clients 16*a–h* selectively access the server 12. In one embodiment, one or more of the clients 16*a–h* are themselves servers maintained by service providers (e.g., Netcom (TM), CompuServe (TM), AmericaOnline (TM), etc.) which provide for communication between a large number of subscribers (or users) 18*a–b* and the server 12. Typically, but not necessarily, the subscribers 18*a–b* will respectively comprise personal computers (PCs).

The server 12 has a database 52 defined in the memory 30. In the illustrated embodiment, such memory 30 comprises a hard disk drive having information arranged thereon to define the database 52, but could alternatively comprise one or more CD-ROMs, random access memory (RAM), read only memory (ROM), optical storage, tape storage, or any other appropriate data storage medium.

In one embodiment, the database 52 is a database of businesses and contains a predetermined amount of basic information (e.g.; business name, address, phone number) for each included business. In this embodiment, the database 52 includes additional information about a business if a business is willing to pay extra. The additional information comprises graphics (e.g., a storefront 98), size of display information, location of display information, virtual reality scenes, virtual reality objects, and hyperlinks, or any combination of such additional information for each business.

In one embodiment, the database is a Wide Area Information Servers (WAIS) database. In alternative embodiments, the database of the server 12 is a Sybase (TM), or Oracle (TM) database. Other forms of databases can be employed. WAIS is designed as a client-server system, and WAIS clients are able to interrogate WAIS databases using a well known protocol. Because this protocol is supported by many World Wide Web clients, it is usually possible for a client to directly interrogate a WAIS server by constructing a URL (uniform resource locator) including appropriate queries that points to the WAIS server. On the other hand, some clients do not support the WAIS

6,002,853

7                                    8

protocol, and other methods, such as FORM interfaces, are provided from the server to the client for constructing WAIS queries. FORM interfaces are know to those who use the World Wide Web. A FORM interface has fields that can be filled in, or pop up menus from which selections can be made, and usually has a "SEND" or "QUERY" button and a "CLEAR" or "CANCEL" button. There are a large number of gateway programs that allow non WAIS capable clients access to a WAIS server.

One common program for accomplishing these tasks is WAIS.PL, a PERL (practical extraction and reporting language) script (program) that obtains a query string from a client and passes the query to a WAIS database query engine (WAISQ) at the server, and returns the results to the user as an HTML document.

Other server-side programs for accomplishing these tasks include SON-OF-WAIS.PL, a perl script written by Eric Lease Morgan of North Carolina State University Libraries; KIDOWAIS.PL, another PERL script; SFGATE, which does not access a server-side WAIS query engine but instead has WAIS client software built-in; WAISGATE, available from WAIS Inc.; and WWWWAIS, a C program that acts as a gateway between the programs (WAISQ and WAISSEARCH) that search WAIS indexes and a FORM capable web browser.

There are also many software programs for linking the World Wide Web to commercial database packages like Oracle or Sybase. One is GSQL-ORACLE BACKEND, for use with Oracle databases, which was written by James Pitkow of the Graphics, Visualization, and Usability Center at the Georgia Institute of Technology.

Another is WEB/GENERA, for use with Sybase databases, which was developed by Stanley Letovsky with support of the National Science Foundation.

Another is WDB, for use with Sybase databases, which allows use of high-level description files to specify the structure of a database and the format of responses so that an interface between the World Wide Web and a Sybase database can be developed without the need to write any code. WDB was written by Bo Frese Rasmussen of the European Southern Observatory.

Another is GSQL, a C program, for use with Sybase or other SQL databases. GSQL was written by Jason Ng of NCSA (National Center for Supercomputing Applications at the University of Illinois at Champaign-Urbana).

Another is HTORACLE, for use with Oracle databases. HTOracle was written by Arthus Secret of CERN (Centre Europeen pour la Recherche Nucleaire in Geneva, Switzerland).

Another is ORAPLEX, for use with Oracle databases. ORAPLEX was written by Guy Decoux of the Institut National de la Recherche Agronomique in France.

Another is TR-WWW, which is a Macintosh-based search engine that works only with a MacHTTP (TM) server.

Most of the above database gateway programs, as well as detailed documentation discussing their use, is available via the World Wide Web. Documentation is also available in various books that describe the World Wide Web and HTML. Many such gateway programs are available by connecting to NCSA's server at the University of Illinois, Champaign-Urbana (FTP://FTP.NCSA.UIUC.EDU).

The memory 30 of the server 12 is also loaded with graphics, virtual reality scenes, and/or virtual reality objects 54 that will be described below in greater detail.

FIGS. 3 and 5–10 illustrates operation of the system.

In step 56, one of the clients 16a–h connects to the server 12. For example, the client connects to the server 12 via the World Wide Web by entering on a client browser the URL of the server. After step 56, the system proceeds to step 58.

In step 58, the server 12 presents to the client a graphical user interface 88 including a query area 90 in which a search query can be generated. In one embodiment, this graphical user interface includes a FORM interface, discussed above. The interface optionally comprises pull down menus. In one embodiment, the graphical user interface 88 comprises a graphical representation of an elevator including an area 90 in which query information can be entered or selected from menus. In one embodiment, the elevator is a virtual reality space which the user of the client virtually enters, and within which the search query is generated. In one embodiment, the user is able to select the number of "hits" the user wants to see. In an alternative embodiment, the number of "hits" generated by the search is limited to a predetermined number. After step 58, the system proceeds to step 60. In one embodiment, the interface is particularly suited for searching for businesses, and provides for searching at least by category (type of goods or services). In alternative embodiments, the interface provides for searching of any desired field selected from a plurality of fields, such as category (type of goods or services), location, phone number, zip code, area code, subcategory (e.g. type of cuisine—Pizza, German, Vietnamese, Chinese), sublocation (Eastside, North, Suburbs, etc.).

At step 60, the client sends the search query to the server. After step 60, the system proceeds to step 62.

At step 62, the server performs the database search in response to the query. In the illustrated embodiment, visual indicators give the appearance of movement of the elevator while the search request is being processed. For example, floor indicators 92a–f can change to give the impression the elevator is ascending or descending. Movement of bars or other graphics 94a–e can take place to give the impression of a window 96 in the elevator, and movement at the elevator relative to a building. For example, in one embodiment, the server causes the client to display movement of the elevator (e.g., a movie, such as a QuickTime movie or MPEG movie, simulates movement of the elevator). After step 62, the system proceeds to step 64.

At step 64, the server creates a virtual reality space by selecting and assembling graphics or virtual reality spaces and items in response to the results of the database search. At step 66, the server 12 sends a virtual reality space to the client. At step 68, the client recognizes that virtual reality information is being sent, and launches a virtual reality viewer (e.g.; a web browser launches a virtual reality helper application such as QuickTime for Virtual Reality).

For example, in one embodiment, a navigable virtual reality scene is presented comprising a street having storefronts 98, 100, 102, 104, 106, 108 representing the best hits from the database search. In one embodiment, a predetermined minimum amount of information about each business is provided on the street (e.g., on a letterbox at the end of the street or on a window or door of a small storefront). If the business is one that paid extra, it will have a storefront. Businesses that pay extra may also have a storefront closer to the elevator or of a different size.

In one embodiment, the virtual reality scene includes areas (e.g., billboards) including advertising of related products or services. For example, if the search was a search for restaurants, a billboard 100 may show an advertisement for a cola product. In one embodiment, the advertising com-

A 61

6,002,853

9

prises a movie (e.g., a movie playing within an area of the screen, such as to give the appearance of a movie projected on a building or billboard). Individual businesses may have their own signs which may rotate, for example. Other features of streets, such as street lamps, phone booths, etc., may be presented for added visual effect.

In the illustrated embodiment, if a user of a client navigates into one of the storefronts, the user is sent by hyperlink to a server maintained by the associated business. In an alternative embodiment, if a user of a client navigates into one of the storefronts, the user encounters another virtual reality space in which the user may pick up and inspect virtual objects, and make purchases via the server 12.

It should be noted that the appearance of the street presented will vary depending on the results of the database search. The presented street will have an appearance of interest to the user doing the search, and will have storefronts of businesses of interest to that user (e.g., in a certain geographic location, such as within a certain zip code, providing certain goods or services, or having a certain name). Thus, like businesses are grouped together for the user's convenience on a boulevard. In one embodiment, the appearance of the street (excluding the storefronts) changes depending on the selected category; e.g., because people go to restaurants at night, a search for restaurants can produce a nighttime scene. Different types of music can play while a user navigates through a scene depending on the category selected. Alternatively, audible advertising can play while the user navigates through the scene.

FIGS. 4A and 4B illustrate one embodiment of making a virtual reality scene to be used in displaying database search results. As illustrated in FIG. 4A, a camera 70 is used to take several pictures of an actual street from various vantage points. These photographs are digitized, and electronically stitched together, as illustrated in FIG. 4B. To allow stitching of photographs where the camera turns corners, the images are warped such that straight lines become curved lines, so that all adjacent photographs can be stitched together side by side to form a panorama. The virtual reality player in the client computer only views one small portion of the stitched photograph panorama at a time, and unwarps that portion so that straight lines appear straight. As the user navigates in the scene, the virtual reality player keeps up with the user's movements, unwarping and displaying the user's vantage point of the panorama on the fly. In an alternative embodiment, the virtual reality streets are formed using animations.

In one embodiment, the server contains a regular graphic (e.g., a GIF or JPEG) of a storefront for each business, and the server creates a virtual reality scene by stitching together graphics in response to the results of a database search.

Objects displayed when entering certain stores are virtual reality objects. Virtual reality objects are unlike scenes because scenes involve navigating through a single panoramic image, whereas objects are defined from a number of images of the object taken at different angles. In an alternative embodiment, the virtual reality objects are formed using animations.

FIGS. 5–10 illustrate screens that are sent from the server to the client in response to a database search query. FIG. 5 illustrates the graphical interface and how any of various available fields can be searched.

FIG. 6 illustrates that the elevator door will open after the virtual reality scene has been constructed.

FIG. 7 illustrates a scene after a user has navigated part way down a street.

10

FIG. 8 illustrates a user facing a storefront. The storefront can contain information that is typically contained in a Yellow Pages ad. If the user advances, the store is entered. This can result in the client connecting to the home page of the store, or other results, such as a virtual scene of a store interior including virtual reality objects.

FIG. 9 illustrates that a user can re-enter the elevator to perform a new search.

FIG. 10 illustrates an alternative street created in response to a different search.

Thus, a system has been described which provides for presentation of Yellow Pages information in a more appealing format.

The invention has been described in language more or less specific as to structural and methodical features. It is to be understood, however, that the invention is not limited to the specific features shown and described, since the means herein disclosed comprise preferred forms of putting the invention into effect. The invention is, therefore, claimed in any of its forms or modifications within the proper scope of the appended claims appropriately interpreted in accordance with the doctrine of equivalents.

I claim:

1. A server configured to communicate with a client that selectively connects to the server, the server comprising:

a memory, and a database defined in the memory, the database including data about businesses, which data includes at least the names of respective businesses and categories in which respective businesses are classified;

communication hardware providing for communication between the server and the client;

the server communicating to the client an interface for use in requesting a search of the database in response to a client connecting to the server, the server, in response to a search request made using the interface, searching the database and generating a screen display for the client, the screen display varying depending on the results of the search and including graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts, respective graphics items being associated with respective businesses, multiple storefronts of the screen display being associated with businesses of the same category depending on the search request, the screen display being navigable to reveal graphics items adjacent those that are displayed, the selection of individual graphics items for inclusion in the screen display varying depending on the results of the search.

2. A server in accordance with claim 1 wherein the businesses are respectively classified in the database as either belonging to a first classification, or a second classification, and wherein the screen display visually differentiates any second classification business which meet the criteria of the search from first classification businesses which meet the criteria of the search.

3. A server in accordance with claim 1 wherein the data, in the database, about respective businesses further includes the address of the business.

4. A server in accordance with claim 1 wherein the data, in the database, about respective businesses further includes the phone number of the business.

5. A server in accordance with claim 1 wherein the data, in the database, about respective businesses further includes the goods or services provided by the business.

6. A server in accordance with claim 1 wherein the appearance of the respective storefronts depends on the results of the search.

6,002,853

11

**7**. A server in accordance with claim **1** wherein the graphics items are hyperlinked to respective web pages.

**8**. A server in accordance with claim **1** wherein the interface has the appearance of an elevator.

**9**. A server in accordance with claim **1** wherein the server generates a virtual reality scene in response to the client requesting a search of the database, the virtual reality scene defining the screen display.

**10**. A memory bearing software to be executed by a server configured to communicate with a client that selectively connects to the server, the software being programmed to:

communicate to the client an interface for use in requesting a search of a database in response to a client connecting to the server, the database including data about businesses, the data including categories in which respective businesses are classified;

cause the server, in response to a search request made using the interface, to search the database and cause a screen display to be generated for the client, the screen display varying depending on the results of the search and including graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts, respective graphics items being associated with respective businesses, multiple storefronts of the screen display being associated with businesses of the same category depending on the search request, the

12

screen display being navigable to reveal graphics items adjacent those that are displayed, the selection of individual graphics items for inclusion in the screen display varying depending on the results of the search.

**11**. A method comprising:

communicating to a client an interface for use in requesting a search of a database in response to the client connecting to a server, the database including data about businesses, the data including categories in which respective businesses are classified;

causing the server, in response to a search request made using the interface, to search the database and cause a screen display to be generated for the client, the screen display varying depending on the results of the search and including graphics items arranged to provide the appearance of at least part of a commercial area, at least some of the graphics items having the appearance of storefronts, respective graphics items being associated with respective businesses, multiple storefronts of the screen display being associated with businesses of the same category depending on the search request, the screen display being navigable to reveal graphics items adjacent those that are displayed, the selection of individual graphics items for inclusion in the screen display varying depending on the results of the search.

* * * * *

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## ICON INTERNET COMPETENCE NETWORK B.V. v. TRAVELOCITY.COM LP

## 2013-1295

## PROOF OF SERVICE

I hereby certify that true and correct copies of the foregoing Appellant's Opening Brief were served upon counsel for Defendants by Federal Express, standard overnight, on counsel for all parties in accordance with the address and numbers listed below, on the 28th day of June, 2013.

Thomas M. Melsheimer, Esq.
Fish & Richardson, P.C.
1717 Main Street, Suite 5000
Dallas, Texas  75201


*/s/ Erik J. Osterrieder*_____
Erik J. Osterrieder
Attorney for Appellant
ICON Internet Competence Network B.V.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)

I, Erik J. Osterrieder, am the attorney for the appellants in this appeal. I certify that the preceding brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, and the word count certification of Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, because the brief contains 8,048 words, excluding the parts of the brief exempted by the Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), as indicated by the word count of the word-processing system used to prepare the brief.

*/s/ Erik J. Osterrieder*_____
Erik J. Osterrieder
Attorney for Appellant
ICON Internet Competence Network B.V.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## ICON INTERNET COMPETENCE NETWORK B.V. v. TRAVELOCITY.COM LP

## 2013-1295

## PROOF OF SERVICE

I hereby certify that true and correct copies of the foregoing Appellant's Opening Brief were served upon counsel for Defendants by Federal Express, standard overnight, on counsel for all parties in accordance with the address and numbers listed below, on the 28th day of June, 2013.

Thomas M. Melsheimer, Esq.
Fish & Richardson, P.C.
1717 Main Street, Suite 5000
Dallas, Texas  75201


*/s/ Erik J. Osterrieder*_____
Erik J. Osterrieder
Attorney for Appellant
ICON Internet Competence Network B.V.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)

I, Erik J. Osterrieder, am the attorney for the appellants in this appeal. I certify that the preceding brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, and the word count certification of Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, because the brief contains 8,048 words, excluding the parts of the brief exempted by the Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), as indicated by the word count of the word-processing system used to prepare the brief.

*/s/ Erik J. Osterrieder*_____
Erik J. Osterrieder
Attorney for Appellant
ICON Internet Competence Network B.V.